**POLLAK et al. v. PUBLIC UTILITIES COMMISSION OF THE DISTRICT OF COLUMBIA et al.**

No. 10777.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1951.

Decided June 1, 1951.
Writ of Certiorari Granted Oct. 15, 1951.
See 72 S.Ct. 77.

Paul M. Segal, Washington, D. C., with whom Franklin S. Pollak, Washington, D. C., was on the brief, pro se, for appellants. Harry P. Warner and Quayle B. Smith, Washington, D. C., entered appearances for appellants.

Daryal A. Myse, Washington, D. C., with whom Edmund L. Jones and F. G. Awalt, Washington, D. C., were on the brief, for appellee Capital Transit Co.

Lloyd B. Harrison, Counsel, Public Utilities Commission of the District of Columbia, Washington, D. C., with whom Vernon E. West, Corporation Counsel, Washington, D. C., was on the brief, for appellee Public Utilities Commission of the District of Columbia.

W. Theodore Pierson, Washington, D. C., with whom Vernon C. Kohlhaas and Thomas N. Dowd, Washington, D. C., were on the brief, for appellee Washington Transit Radio, Inc.

Charles Black of the bar of New York, Morris L. Ernst, James Lawrence Fly, Osmond K. Fraenkel, all of New York City,

Alexander B. Hawes, Washington, D. C., Arthur Garfield Hays, New York City, Laurence A. Knapp, Washington, D. C., all members of the bar of this court, and Herbert Monte Levy and Bernard Weitzman, New York City, of the bar of New York, filed a brief on behalf of the American Civil Liberties Union as amicus curiae urging reversal.

Before EDGERTON, BAZELON, and FAHY, Circuit Judges.

EDGERTON, Circuit Judge.

Appellee Capital Transit Company (Transit) operates streetcars and buses in the District of Columbia. In 1948 Transit made a contract with appellee Washington Transit Radio, Inc., (Radio) by which Radio was to install and maintain loudspeakers in Transit vehicles and provide broadcasts at least 8 hours[1] daily except Sunday. In October, 1949, loudspeakers were in operation in 212 vehicles and it was planned to increase the number to 1,500.

Though Transit and Radio call the broadcasts "music as you ride", they include not only music but also "commercials, announcements, and time signals". The contract permits six minutes of "commercial announcements" per hour. These vary from 15 to 35 seconds in length and are usually scheduled about once in five minutes, though the interval varies.

Appellee Public Utilities Commission received protests against Transit's use of radio. It ordered an investigation and held a hearing "to determine whether or not the installation and use of radio receivers on the street cars and busses of Capital Transit Company is consistent with public convenience, comfort and safety * * *." Appellants, who ride Transit vehicles, and other persons and organizations were allowed to intervene and took part in the hearing. The Commission found that transit radio does not reduce safety, "tends to improve the conditions under which the public rides," and "is not inconsistent with public convenience, comfort and safety."

The Commission's final order "dismissed" its investigation.

Appellants and others appealed to the District Court from the Commission's order. Appellants' petition of appeal states that appellants are "obliged to use the street cars and busses of Capital Transit Company in connection with the practice of their profession and on other occasions and are thereby subjected against their will to the broadcasts in issue. These broadcasts make it difficult for petitioners to read and converse * * *." Each of the appellees, i. e. the Commission, Transit, and Radio, moved to dismiss the petitions of appeal as not stating claims on which relief could be granted and as not within the court's jurisdiction. The court dismissed the petitions on the ground that "no legal right of the petitioners * * * has been invaded * * *." This appeal followed.

Appellants' chief contention is that Transit radio deprives them of liberty without due process of law in violation of the Fifth Amendment of the Constitution.

1. The jurisdiction of the Public Utilities Commission, the District Court, and this court are clear. All public utilities are required by Act of Congress to "furnish service and facilities reasonably safe and adequate and in all respects just and reasonable" and the term "service" is used "in its broadest and most inclusive sense." D.C.Code (1940) §§ 43–301, 43–104. The Commission is authorized to fix and enforce standards of service. §§ 43–320, 43–303, 43–1002.

Since the Commission's order was its final decision that Transit may use loudspeakers in its streetcars and buses, the order was appealable. "Any * * * person * * * affected by any final order or decision of the Commission, other than an order fixing or determining the value of the property of a public utility in a proceeding solely for that purpose, may" appeal to the District Court and from

[1]. At the time of the Commission's hearing, actual hours of operation were 7 a.m. to 7 p.m.

that court to, this. D.C.Code (1940) § 43–705. "Administrative determinations which are not commands may for all practical purposes determine rights as effectively as the judgment of a court, and may be reexamined by courts under particular statutes providing for the review of 'orders'." American Federation of Labor v. National Labor Relations Board, 308 U.S. 401, 408, 60 S.Ct. 300, 303, 84 L.Ed. 347. Since the appellants use the service of Transit and intervened before the Commission they are "affected by" the Commission's order and may appeal.[2]

2. Transit passengers commonly have to hear the broadcasts whether they want to or not.[3] The Commission made no finding on this point but the fact is well known. It was proved by many witnesses. It is in legal effect admitted by appellees' motions to dismiss the petition of appeal, since the petition states that appellants "are subjected against their will to the broadcasts in issue. These broadcasts make it difficult for petitioners to read and converse * * *." The brief of appellee Radio admits the fact in these terms: "it is impossible to give effect to this alleged right [not to listen] without frustrating the desire of other passengers to listen * * *." Appellee Transit says in its brief: "The record shows that *every precaution is taken* in the installation of the equipment and its maintenance *to minimize the sound level at the operators' position* and to distribute sound evenly throughout the public spaces in the vehicle * * *."[4] WWDC-FM, the transmitting station, advertised in 1949 that Transit Radio was "delivering a guaranteed audience."[5] The passengers are known in the industry as a "captive audience". Formerly they were free to read, talk, meditate, or relax. The broadcasts have replaced freedom of attention with forced listening.

The dismissed petition of appeal states that appellants are "obliged to use the street cars and busses" of Transit. Most people have to use mass transportation. In the District of Columbia this means they have to use Transit and hear the broadcasts.

2. Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302. In United States v. Public Utilities Commission, 80 U.S.App.D.C. 227, 151 F.2d 609, we held that a consumer of electricity and intervenor before the Commission was "affected by" and could appeal from a Commission order fixing electric rates. We said at page 231 of 80 U.S.App.D.C., at page 613 of 151 F.2d: "Congress has used language, throughout the applicable Code sections, indicating an intention that consumers shall have a right to challenge the Commission's actions."

3. Appellants' supplementary application to the Commission for rehearing contains a physicist's affidavit explaining in technical terms that "the ear hears plainly at its low sound level what the meter does not detect at its high sound level."

4. Emphasis added.

5. The 1949 Radio Annual, p. 363. In their supplementary application for reconsideration, appellants referred to "a brochure issued by Transit Radio, Inc.," the corporation described by a witness for Washington Transit Radio, Inc., as the national or parent company. This brochure is entitled "A New Idea— A New Voice—A New Medium for Advertisers—transit radio." Washington is one of the cities concerning which it says: "The advertiser knows how large an audience he is reaching in each Transit Radio city because the rate he pays is based essentially on the actual count of paid passenger fares. No surveys are necessary—guesswork plays no part. . . . Transit radio . . . provides a definitely measurable audience . . . When the studio microphone is switched on for the announcer to read a commercial, the transmitter automatically emits a supersonic note which activates *the voice emphasis circuit* and raises the volume about 25 per cent. The result: *Everyone hears the commercial!* . . . Speakers are mounted on the overhead panels, alternately on the right and left sides, so that every passenger gets perfect reception from a speaker just overhead. If they can hear—they can hear your commercial!" Appellants asked to be permitted to examine concerning the "25 per cent" statement a witness who had testified that "The measurable difference acoustically" between the radio sets when operating on voice and on music "is hardly discernible".

Even as between the District and the adjoining Pentagon region in Virginia the Supreme Court has said: " * * * most government employees, in going to and returning from their work, were compelled to begin or complete their trips by utilizing buses or streetcars of Capital Transit.". United States v. Capital Transit Co., 325 U.S. 357, 359, 65 S.Ct. 1176, 1177, 89 L.Ed. 1663.

■ 3. Though statutes and the law of torts forbid invasions of liberty by private individuals, the constitutional guarantees of liberty are directed against government action. But acts of individuals are beyond the reach of these guarantees only when they are "unsupported by state authority in the shape of laws, customs, or judicial or executive proceedings." Civil Rights Cases, 109 U.S. 3, 17, 3 S.Ct. 18, 25, 27 L.Ed. 835. For example, since Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, was decided a state cannot "by permitting a party to take over a part of its election machinery * * * avoid the provisions of the Constitution forbidding racial discrimination in elections * * *." Rice v. Elmore, 4 Cir., 165 F.2d 387, 389. A private corporation that owns the streets of a town may no more abridge the freedoms of press and religion than a municipality regularly organized. Marsh v. Alabama, 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265. The Supreme Court has recently said: "When authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself." American Communications Ass'n v. Douds, 339 U.S. 382, 401, 70 S.Ct. 674, 685, 94 L.Ed. 925.

■ The forced listening imposed on Transit passengers results from government action. By authorizing Transit and forbidding others to operate local streetcars and buses, Congress made it necessary to ride the vehicles in which Transit makes it necessary to hear the broadcasts. Streetcars and buses cannot operate in city streets without a franchise. Congress has given Transit not only a franchise but a virtual monopoly of the entire local business of mass transportation of passengers in the District of Columbia.[6]

■ Furthermore the forced listening has been sanctioned by the governmental action of the Commission. If the Commission had found it contrary to public comfort or convenience, or unreasonable, it would have stopped. Because the Commission decided otherwise it continues. To suggest that a "negative" order cannot be the final step in a misuse of government power is to assert a distinction the Supreme Court has repudiated. " * * * An order of the Commission dismissing a complaint on the merits and maintaining the *status quo* is an exercise of administrative function, no more and no less, than an order directing some change in status." Rochester Tel. Corp. v. United States, 307 U.S. 125, 142, 59 S.Ct. 754, 763, 83 L.Ed. 1147. Mitchell v. United States, 313 U.S. 80, 92, 61 S.Ct. 873, 85 L.Ed. 1201; Henderson v. United States, 339 U.S. 816, 70 S.Ct. 843, 94 L.Ed. 1302. Even failure to enter any order may be a denial of constitutional rights. Smith v. Illinois Bell Tel.

6. The monopoly is apparently complete except that an interurban line that operates in one part of the District carries local passengers. This line also, according to the testimony, subjects its passengers to forced listening.

Transit was formed, under an Act and a Joint Resolution of Congress, by a merger of previously independent lines. Act of March 4, 1925, 43 Stat. 1265; Joint Resolution of January 14, 1933, 47 Stat. 752.

Congress authorized the end of competition and enacted that there should be no new competition except upon a showing exceedingly difficult to make. "No competitive street railway or bus line, that is, bus or railway line for the transportation of passengers of the character which runs over a given route on a fixed schedule, shall be established without the prior issuance of a certificate by the Public Utilities Commission of the District of Columbia to the effect that the competitive line is necessary for the convenience of the public." Sec. 4 of the Joint Resolution, 47 Stat. 760.

Co., 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747. By dismissing its investigation the Commission declined to prevent valid action of Congress from having an unintended and unnecessary result.

■ 4. No occasion had arisen until now to give effect to freedom from forced listening as a constitutional right. Short of imprisonment, the only way to compel a man's attention for many minutes is to bombard him with sound that he cannot ignore in a place where he must be. The law of nuisance protects him at home.[7] At home or at work, the constitutional question has not arisen because the government has taken no part in forcing people to listen. Until radio was developed and someone realized that the passengers of a transportation monopoly are a captive audience, there was no profitable way of forcing people to listen while they travel between home and work or on necessary errands. Exploitation of this audience through assault on the unavertible sense of hearing is a new phenomenon. It raises "issues that were not implied in the means of communication known or contemplated by Franklin and Jefferson and Madison."[8] But the Bill of Rights, as appellants say in their brief, can keep up with anything an advertising man or an electronics engineer can think of. In United States v. Classic, Mr. Justice Stone said for the Supreme Court: "in determining whether a provision of the Constitution applies to a new subject matter; it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the

instrument itself discloses." 313 U.S. 299, 316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368.

■ If Transit obliged its passengers to read what it liked or get off the car, invasion of their freedom would be obvious. Transit obliges them to hear what it likes or get off the car. Freedom of attention, which forced listening destroys, is a part of liberty essential to individuals and to society.[9] The Supreme Court has said that the constitutional guarantee of liberty "embraces not only the right of a person to be free from physical restraint, but the right to be free in the enjoyment of all his faculties * * *."[10] One who is subjected to forced listening is not free in the enjoyment of all his faculties.

■ Both the decision and the opinions in Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513, give great weight to the public interest in freedom from forced listening. The Supreme Court upheld a municipal ordinance prohibiting loud and raucous sound trucks in public streets. Mr. Justice Reed's opinion, for three Justices, said, 336 U.S. at pages 86–7, 69 S.Ct. at page 453, 93 L.Ed. 513: "The unwilling listener is not like the passer-by who may be offered a pamphlet in the street but cannot be made to take it. In his home or on the street he is practically helpless to escape this interference with his privacy by loud speakers except through the protection of the municipality." Kovacs had broadcast, along with music, comment on a labor dispute. He contended that the ordinance abridged his freedom of speech. The Supreme Court's decision upholding the ordinance means that the public interest in freedom from forced listening is so important as to outweigh even the public interest in making more effective, by amplifying, a communication protected by the First Amendment. It would seem to follow

7. Stodder v. Rosen Talking Machine Co., 241 Mass. 245, 135 N.E. 251, 22 A.L.R. 1197; Id., 247 Mass. 60, 141 N.E. 569; Fos v. Thomassie, La.App.1946, 26 So. 2d 402; Five Oaks Corp. v. Gathmann, 1948, 190 Md. 348, 58 A.2d 656.

8. Mr. Justice Frankfurter, concurring, in Kovacs v. Cooper, 336 U.S. 77, 96, 69 S.Ct. 448, 458, 93 L.Ed. 513.

9. "The right of free speech is guaranteed every citizen that he may reach the minds of willing listeners * * *." Mr. Justice Reed in Kovacs v. Cooper, 336 U.S. 77, 87, 69 S.Ct. 448, 454, 93 L.Ed. 513.

10. Grosjean v. American Press Co., 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L. Ed. 660.

457

that the public interest in freedom from forced listening outweighs the private interest in making more effective, by amplifying, a communication not protected by the First Amendment. The Amendment does not protect commercial advertising.[11]

Validation of the forced listening involved here would result in this curious paradox. Although a municipality may forbid speech protected by the First Amendment from being broadcast in a street, where no one need hear it more than a few minutes, speech not protected by the First Amendment may be broadcast in a streetcar where passengers must hear it for a substantial time.

Of course freedom from forced listening, like other freedoms, is not absolute. No doubt the government may compel attention, as it may forbid speech, in exceptional circumstances. But a deprivation of liberty to which the government is a party is unconstitutional when it is "arbitrary or without reasonable relation to some purpose within the competency of the state to effect." Meyer v. State of Nebraska, 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042. Forcing Transit passengers to hear these broadcasts has no reasonable relation to any such purpose.[12] Some discomforts may perhaps be inevitable incidents of mass transportation, but forced listening is neither incidental nor inevitable.

It deprives the appellants and other passengers who object to the broadcasts of their liberty for the private use of Transit, Radio, and passengers who like the broadcasts. This loss of freedom of attention is the more serious because many people have little time to read, consider, or discuss what they like, or to relax. The record makes it plain that the loss is a serious injury to many passengers.[13] They suffer not only the discomfort of hearing what they dislike but a sense of outrage at being compelled to hear whatever Transit and Radio choose.

Willing hearers are entertained by the broadcasts. But the profit of Transit and Radio and the entertainment of one group of passengers cannot justify depriving another group of passengers of their liberty.[14] The interest of some in hearing what they like is not a right to make others hear the same thing.[15] Even if an impartial survey had shown that most passengers liked the broadcasts or were willing to tolerate them on the supposed chance of a money benefit,[16] that would not be important, since the will of a majority cannot abrogate the constitutional rights of a minority. Moreover there is no evidence that any large group of passengers actually wish to go on being entertained by broadcasts forced upon other passengers at the cost of their comfort and freedom.[17]

11. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262.

12. The record contains a suggestion that transit broadcasts might be useful in "panic control" and other emergencies. But one powerful loudspeaker in each vehicle, available for use when needed, would serve any such purpose. The suggestion is no argument for maintaining six loudspeakers in each vehicle and operating them 12 hours a day.

13. Objection to forced listening is not limited to people who dislike radio. One objecting witness said: "I have three radios in my house and I have three reasons for liking them. The first reason is that you can always turn them off. The second one is that you can choose your program and the third is that you can regulate the volume."

14. Withdrawing this particular entertainment will no more deprive willing hearers of liberty than excluding a man from a particular place imprisons him.

15. The Chairman of the Commission said at the hearing: "The decision of the Commission will be made on the numbers of those saying, 'I like it' and those saying, 'I dislike it.'"

16. The Commission did not find and nothing in the record suggests that Transit gets enough money from the broadcasts, in relation to the number of its passengers, to have any possible effect on fares.

17. An organization employed by appellees Transit and Radio to make a survey of passenger sentiment failed to ask persons who said they favored transit radio whether they would still favor it if

5. It has been argued that when freedom of attention is abridged freedom of speech and press are abridged, and that when Transit sells the forced attention of its passengers to Radio for advertising purposes it deprives them of property as well as liberty. Also, it may well be doubted whether Transit can perform its statutory duty of providing comfortable service for all by giving more than comfortable service to some and less than comfortable service to others. But we need not consider these issues. In our opinion Transit's broadcasts deprive objecting passengers of liberty without due process of law. Service that violates constitutional rights is not reasonable service. It follows that the Commission erred as a matter of law in finding that Transit's broadcasts are not inconsistent with public convenience, in failing to find that they are unreasonable, and in failing to stop them.[18]

This decision applies to "commercials" and to "announcements". We are not now called upon to decide whether occasional broadcasts of music alone would infringe constitutional rights.

6. Congress has provided that after hearing an appeal from the Public Utilities Commission the District Court "shall either dismiss the said appeal and affirm the order or decision of the Commission or sustain the appeal and vacate the Commission's order or decision." D.C.Code (1940) § 43-705. Counsel for the Commission contend that to vacate its order "would be an ineffectual thing, leaving the status quo as it existed prior to the initiation of the investigation" and that if constitutional rights are invaded it "may be the basis for suit for injunction under the court's general equity powers, but it is not a proper basis for an appeal from the Commission's order." In our opinion these contentions are erroneous and the appellants need not sue out an injunction. To say that they "must institute another and distinct proceeding, would be to put aside substance for needless ceremony." Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 591, 46 S.Ct. 408, 409, 70 L.Ed. 747.

The Wagner Act provided that a Circuit Court of Appeals might enforce, modify and enforce, or set aside, an order of the National Labor Relations Board.[19] It did not provide that a court might remand a cause to the Board for further proceedings. But in Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 372-373, 59 S.Ct. 301, 306, 83 L.Ed. 221, the Supreme Court held that "If the court itself had set aside the findings and order of the Board * * * the court could have remanded the cause for further proceedings in conformity with its opinion * * *. The jurisdiction to review the orders of the Labor Relations Board is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administra-

they knew it caused serious annoyance to a substantial number of passengers. Yet this survey did ask persons who said they opposed transit radio whether they would still object if the majority approved. To investigate the altruism of the objecting group and not that of the approving group reflects bias and produces a biased result. Moreover the survey did not inquire into the intensity of likes and dislikes. It ignored the question how many persons have been induced by the broadcasts to use Transit less, or more, than formerly.

All persons interviewed were passengers on radio-equipped vehicles. According to the report 76.3% said they favored radio, 13.9% did not care, 3.2% "didn't know", and 6.6% objected but 3.6% said they would not oppose the ma-

jority will. An unbiased inquiry which did not claim to be scientific produced a different result. On November 6, 1949, the Washington Post printed two "ballots", one reading "Yes I favor radio broadcasts in streetcars and buses" and the other "No I do not favor radio broadcasts in streetcars and buses." On November 13, 1949 the Post reported that of the 5,402 ballots returned, 2,387 favored the broadcasts and 3,015, or 55.8%, did not.

18. The fact that administrative agencies may not consider issues involving the constitutionality of congressional action is irrelevant since there is no such issue in this case.

19. § 10(e), 49 Stat. 454, 29 U.S.C.A. § 160(e).

tive province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action. The purpose of the judicial review is consonant with that of the administrative proceeding itself,—to secure a just result with a minimum of technical requirements. The statute with respect to a judicial review of orders of the Labor Relations Board follows closely the statutory provisions in relation to the orders of the Federal Trade Commission, and as to the latter it is well established that the court may remand the cause to the Commission for further proceedings * * *." Similarly in Federal Power Commission v. Pacific Power & Light Co., 307 U.S. 156, 159–160, 59 S.Ct. 766, 768, 83 L.Ed. 1180, in holding that a Court of Appeals had jurisdiction to review a Power Commission order declining to authorize a transfer of corporate assets the Supreme Court said: "it is urged that * * * the court itself cannot lift the prohibition of the statute by granting permission for the transfer, nor order the Commission to grant such permission. And so it is claimed that any action of a court in setting aside the order of the Commission would be an empty gesture * * *. But * * * The court has power to pass judgment upon challenged principles of law insofar as they are relevant to the disposition made by the Commission. '* * * a judgment rendered will be a final and indisputable basis of action * * *.' Interstate Commerce Comm. v. Baird, 194 U.S. 25, 38 [24 S.Ct. 563, 566, 48 L.Ed. 860]. In making such a judgment the court does not intrude upon the province of the Commission, while the constitutional requirements of 'Case' or 'Controversy' are satisfied. For purposes of judicial finality there is no more reason for assuming that a Commission will disregard the direction of a reviewing court than that a lower court will do so."

The judgment of the District Court is therefore reversed with instructions to vacate the Commission's order and remand the case to the Commission for further proceedings in conformity with this opinion.

Reversed.