## PUBLIC UTILITIES COMMISSION OF THE DISTRICT OF COLUMBIA ET AL. v. POLLAK ET AL.

NO. 224.

Argued March 3, 1952.—Decided May 26, 1952.

*W. Theodore Pierson* argued the cause for petitioners in No. 224 and respondents in No. 295. On the brief were *Vernon E. West* and *Lloyd B. Harrison* for the Public Utilities Commission of the District of Columbia, *Edmund L. Jones, F. Gloyd Awalt, Samuel O. Clark, Jr., Daryal A. Myse* and *W. V. T. Justis* for the Capital Transit Co., and *Mr. Pierson, Vernon C. Kohlhaas* and *Thomas N. Dowd* for the Washington Transit Radio, Inc.

*Paul M. Segal* argued the cause for respondents in No. 224 and petitioners in No. 295. With him on the brief were *John W. Willis, Charles L. Black, Jr.* and *Harry P. Warner.* Also on the brief was *Franklin S. Pollak, pro se.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here is whether, in the District of Columbia, the Constitution of the United States precludes a street railway company from receiving and amplifying radio programs through loudspeakers in its passenger vehicles under the circumstances of this case.

The service and equipment of the company are subject to regulation by the Public Utilities Commission of the District of Columbia. The Commission, after an investigation and public hearings disclosing substantial grounds for doing so, has concluded that the radio service is not inconsistent with public convenience, comfort and safety and "tends to improve the conditions under which the public ride." The Commission, accordingly, has permitted the radio service to continue despite vigorous protests from some passengers that to do so violates their constitutional rights. For the reasons hereafter stated, we hold that neither the operation of the service nor the action of the Commission permitting its operation is precluded by the Constitution.

The Capital Transit Company, here called Capital Transit, is a privately owned public utility corporation, owning an extensive street railway and bus system which it operates in the District of Columbia under a franchise from Congress.[1] Washington Transit Radio, Inc., here called Radio, also is a privately owned corporation doing business in the District of Columbia. Both are petitioners in No. 224.

---

[1] Capital Transit Company originates from the Act of Congress of March 4, 1925, authorizing the merger of street railway corporations operating in the District of Columbia. 43 Stat. 1265, D. C. Code (1940) § 43–503. The merger was approved by Joint Resolution, January 14, 1933. 47 Stat. 752, 819, D. C. Code (1940) note following § 43–503. That Resolution required the new company to be incorporated under the District Code and its corporate articles to be approved by the Public Utilities Commission of the District. 47 Stat. 753, 819, D. C. Code (1940) note following § 43–503; see 31 Stat. 1284 *et seq.*, D. C. Code (1940) § 29–201 *et seq.*

The same Resolution prohibited the establishment of any competitive street railway or bus line without the issuance of a certificate by the Commission to the effect that such line is necessary for the convenience of the public. 47 Stat. 760, D. C. Code (1940) § 44–201. The only competing line in the District is a relatively small interurban line.

In March, 1948, Capital Transit experimented with "music as you ride" radio programs received and amplified through loudspeakers in a streetcar and in a bus.[2] Those vehicles were operated on various lines at various hours. A poll of passengers who heard the programs showed that 92% favored their continuance. Experience in other cities was studied.[3] Capital Transit granted Radio the exclusive right to install, maintain, repair and use radio reception equipment in Capital Transit's streetcars, busses, terminal facilities, waiting rooms and division headquarters. Radio, in return, agreed to contract with a broadcasting station for programs to be received during a minimum of eight hours every day, except Sundays. To that end Radio secured the services of Station WWDC-FM. Its programs were to meet the specifications stated in Capital Transit's contract.[4] Radio agreed to pay Capital Transit, after a 90-day trial, $6 per month per radio installation, plus additional

---

[2] Typically, the equipment includes a receiving set and six loudspeakers in each vehicle. The set is tuned to a single broadcasting station. The loudspeakers are so located that the radio programs can be heard substantially uniformly throughout the vehicle. The volume of sound is adjusted so as not to interfere with the signals or announcements incident to vehicle operations or generally with conversations between passengers.

[3] Uncontradicted testimony listed approximately the following numbers of vehicles equipped with transit radio in the areas named in October, 1949: St. Louis, Missouri, 1,000; Cincinnati, Ohio, 475; Houston, Texas, 270; Washington, D. C., 220; Worcester, Massachusetts, 220; Tacoma, Washington, 135; Evansville, Indiana, 110; Wilkes-Barre, Pennsylvania, 100; suburban Pittsburgh, Pennsylvania, 75; Allentown, Pennsylvania, 75; Huntington, West Virginia, 55; Des Moines, Iowa, 50; Topeka, Kansas, 50; suburban Washington, D. C., 30. Baltimore, Maryland, was listed but the number of vehicles was not stated.

[4] "(a) Program content shall be of good quality and consonant with a high standard of public acceptance and responsibility, it being understood that all programs shall be carefully planned, edited and

compensation dependent upon the station's receipts from sources such as commercial advertising on the programs. In February, 1949, when more than 20 installations had been made, the service went into regular operation. At the time of the Commission's hearings, October 27–November 1, 1949, there were 212. On that basis the minimum annual payment to Capital Transit came to $15,264. The potential minimum would be $108,000, based upon 1,500 installations. The contract covered five years, with an automatic five-year renewal in the absence of notice to the contrary from either party.

This proceeding began in July, 1949, when the Commission, on its own motion, ordered an investigation. 37 Stat. 983, D. C. Code (1940) §§ 43–408 through 43–410. The Commission stated that Capital Transit had embarked upon a program of installing radio receivers in its streetcars and busses and that a number of protests against the program had been received. Accordingly, the Commission was ordering an investigation to determine whether the installation and use of such receivers was "consistent with public convenience, comfort and safety." Radio was permitted to intervene. Pollak and

---

produced in accordance with accepted practices employed by qualified broadcasting stations.

"(b) Commercial announcements shall not exceed sixty (60) seconds in duration, and cumulatively shall not exceed six (6) minutes in any sixty (60) minute period.

"(c) Broadcast Station shall agree to cancel or suitably to modify any commercial continuity upon notice from Capital that said continuity, or the sponsor thereof, is objectionable. Broadcast Station shall further agree that it shall give notice to Capital within twenty-four (24) hours after the acceptance of each new sponsor.

"(d) Capital is to receive without charge fifty per cent (50%) of the unsold time available for commercial continuity as provided in sub-section (b) hereof, (said free time not to exceed three (3) minutes in any sixty (60) minute period), for institutional and promotional announcements."

Martin, as protesting Capital Transit passengers, also intervened and they are the respondents in No. 224.

The Commission concluded "that the installation and use of radios in streetcars and busses of the Capital Transit Company is not inconsistent with public convenience, comfort, and safety" and dismissed its investigation. 81 P. U. R. (N. S.) 122, 126. It denied reconsideration. 49 Stat. 882, D. C. Code (1940) § 43–704. Pollak and Martin appealed to the United States District Court for the District of Columbia. 49 Stat. 882–884, D. C. Code (1940) §§ 43–705 through 43–710. John O'Dea, as People's Counsel, Capital Transit Company and Washington Transit Radio, Inc., were granted leave to intervene. That appeal was dismissed but Pollak and Martin took the case to the Court of Appeals. 49 Stat. 883, D. C. Code (1940) § 43–705. That court partially reversed the judgment of the District Court and gave instructions to vacate the Commission's order. It remanded the case for further proceedings in conformity with its opinion which included the following statement:

> "In our opinion Transit's broadcasts deprive objecting passengers of liberty without due process of law. Service that violates constitutional rights is not reasonable service. It follows that the Commission erred as a matter of law in finding that Transit's broadcasts are not inconsistent with public convenience, in failing to find that they are unreasonable, and in failing to stop them.
>
> "This decision applies to 'commercials' and to 'announcements.' We are not now called upon to decide whether occasional broadcasts of music alone would infringe constitutional rights." 89 U. S. App. D. C. 94, 102, 191 F. 2d 450, 458.

The Court of Appeals, *en banc,* denied a rehearing. The Commission, Capital Transit and Radio petitioned

this Court for certiorari in No. 224. Contingent upon the granting of certiorari in that case, Pollak and Martin, by cross-petition in No. 295, sought to prohibit Capital Transit from receiving and amplifying in its vehicles not only "commercials" and "announcements," but also the balance of the radio programs. We granted certiorari in both cases because of the novelty and practical importance to the public of the questions involved. 342 U. S. 848. We have treated the petitions as though they were cross-petitions in a single case.

1. *Further facts.*—In this proceeding the courts are expressly restricted to the facts found by the Commission, insofar as those findings do not appear to be unreasonable, arbitrary or capricious.[5]

After reciting that it had given careful consideration to the testimony bearing on public convenience, comfort and safety, the Commission said that—

> "From the testimony of record, the conclusion is inescapable that radio reception in streetcars and busses is not an obstacle to safety of operation.

---

[5] "PAR. 66. In the determination of any appeal from an order or decision of the Commission the review by the court shall be limited to questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary or capricious." 49 Stat. 883, D. C. Code (1940) § 43–706.

On appeal to the District Court—

"the Commission shall file with the clerk of the said court the record, including a transcript of all proceedings had and testimony taken before the Commission, duly certified, upon which the said order or decision of the Commission was based, together with a statement of its findings of fact and conclusions upon the said record, and a copy of the application for reconsideration and the orders entered thereon: . . . ." 49 Stat. 883, D. C. Code (1940) § 43–705.

We treat the Commission's certification of its findings and conclusions, expressed in its statement of December 19, 1949, as meeting the above requirement. 81 P. U. R. (N. S.) 122, 124–126.

"Further, it is evident that public comfort and convenience is not impaired and that, in fact, through the creation of better will among passengers, it tends to improve the conditions under which the public ride." 81 P. U. R. (N. S.), at 126.

Bearing upon its conclusion as to the public comfort and convenience resulting from the radio programs, the Commission cited the opinions of car and bus operators to the effect that the "music on the vehicles had a tendency to keep the passengers in a better mood, and that it simplified transit operations." *Id.*, at 125. The Commission also said that its analysis of accidents "reflects the fact that the radio does not in any way interfere with efficient operation and .has not been the cause of any accidents, according to the testimony of . . . a safety supervisor." *Ibid.* Likewise, the Commission set forth the following as one premise for its conclusions:

"A public opinion survey was conducted by Edward G. Doody & Company, from October 11, 1949, to October 17, 1949, in order to determine the attitude of Capital Transit Company customers toward transit radio. This survey employed the rules of random selection and was confined to interviews aboard radio-equipped vehicles. The principal results obtained through the survey, as presented in this record, were as follows:

"Of those interviewed, 93.4 per cent were not opposed; that is, 76.3 were in favor, 13.9 said they didn't care, and 3.2 said they didn't know; 6.6 per cent were not in favor, but when asked the question 'Well, even though you don't care for such programs personally, would you object if the majority of passengers wanted busses and streetcars equipped with radio receivers,' 3.6 said they would not object or

oppose the majority will. Thus, a balance of 3 per cent of those interviewed were firmly opposed to the use of radios in transit vehicles." [6] *Ibid.*

2. *Statutory authority.*—Apart from the constitutional issues, the order of the Commission dismissing its investigation was in accord with its prescribed statutory procedure and within the discretion properly vested in the Commission by Congress.

Transit radio service is a new income-producing incident of the operation of railway properties. The profit arises from the rental of facilities for commercial advertising purposes. This aspect of the enterprise bears some relation to the long-established practice of renting space for visual advertising on the inside and outside of streetcars and busses.

Through these programs Capital Transit seeks to improve its public relations. To minimize objection to the

---

[6] A comparable survey, made April 1–7, 1949, under the same direction, produced substantially the same result. The weight to be attached to these surveys was a proper matter for determination by the Commission.

The Commission invited views as to the radio service to be given to it freely, either through sworn testimony or otherwise. Many citizens' associations appeared or filed resolutions favoring or opposing the radio service. A large majority favored the service.

That the Commission gave consideration to the intensity and nature of the individual objections raised appears from the following:

"In general, the objections raised by individuals who attended the hearings to radios in transportation vehicles were based upon the following reasons, among others:

"It interfered with their thinking, reading, or chatting with their companions; it would lead to thought control; the noise was unbearable; the commercials, announcements, and time signals were annoying; the music was of the poorest class; the practice deprived them of their right to listen or not to listen; they were being deprived of their property rights without due process; their health was being impaired; the safety of operation was threatened because of the effect of radios upon the operators of the vehicles." 81 P. U. R. (N. S.), at 124.

advertising features of the programs, it requires that at least 90% of the radio time be used for purposes other than commercials and announcements. This results in programs generally consisting of 90% music, 5% news, weather reports and matters of civic interest, and 5% commercial advertising. The advertising is confined to statements of 15 to 30 seconds each. It occupies a total of about three minutes in each hour.

In view of the findings and conclusions of the Commission, there can be little doubt that, apart from the constitutional questions here raised, there is no basis for setting aside the Commission's decision. It is within the statutory authority of the Commission to prohibit or to permit and regulate the receipt and amplification of radio programs under such conditions that the total utility service shall not be unsafe, uncomfortable or inconvenient.

3. *Applicability of the First and Fifth Amendments.*— It was held by the court below that the action of Capital Transit in installing and operating the radio receivers, coupled with the action of the Public Utilities Commission in dismissing its own investigation of the practice, sufficiently involved the Federal Government in responsibility for the radio programs to make the First and Fifth Amendments to the Constitution of the United States applicable to this radio service.[7] These Amendments concededly apply to and restrict only the Federal Government and not private persons. See *Corrigan* v. *Buckley,* 271 U. S. 323, 330; *Talton* v. *Mayes,* 163 U. S. 376,

---

[7]    "Amendment [I.]

"Congress shall make no law . . . abridging the freedom of speech . . . .

.            .            .            .            .

"Amendment [V.]

"No person shall . . . be deprived of life, liberty, or property, without due process of law; . . . ."

382, 384; *Withers* v. *Buckley,* 20 How. 84, 89–91; *Barron* v. *The Mayor and City Council of Baltimore,* 7 Pet. 243; see also, *Virginia* v. *Rives,* 100 U. S. 313, 318.

We find in the reasoning of the court below a sufficiently close relation between the Federal Government and the radio service to make it necessary for us to consider those Amendments. In finding this relation we do not rely on the mere fact that Capital Transit operates a public utility on the streets of the District of Columbia under authority of Congress. Nor do we rely upon the fact that, by reason of such federal authorization, Capital Transit now enjoys a substantial monopoly of street railway and bus transportation in the District of Columbia. We do, however, recognize that Capital Transit operates its service under the regulatory supervision of the Public Utilities Commission of the District of Columbia which is an agency authorized by Congress.[8] We rely particularly upon the fact that that agency, pursuant to protests against the radio program, ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby. 81 P. U. R. (N. S.), at 126.

We, therefore, find it appropriate to examine into what restriction, if any, the First and Fifth Amendments place upon the Federal Government under the facts of this case, assuming that the action of Capital Transit in operating the radio service, together with the action of the Commission in permitting such operation, amounts to suffi-

---

[8] "[W]hen authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself." *American Communications Assn.* v. *Douds,* 339 U. S. 382, 401. Cf. *Smith* v. *Allwright,* 321 U. S. 649; and see *Olcott* v. *The Supervisors,* 16 Wall. 678, 695–696.

cient Federal Government action to make the First and Fifth Amendments applicable thereto.

4. *No violation of the First Amendment.*—Pollak and Martin contend that the radio programs interfere with their freedom of conversation and that of other passengers by making it necessary for them to compete against the programs in order to be heard. The Commission, however, did not find, and the testimony does not compel a finding, that the programs interfered substantially with the conversation of passengers or with rights of communication constitutionally protected in public places. It is suggested also that the First Amendment guarantees a freedom to listen only to such points of view as the listener wishes to hear. There is no substantial claim that the programs have been used for objectionable propaganda. There is no issue of that kind before us.[9] The inclusion in the programs of a few announcements explanatory and commendatory of Capital Transit's own services does not sustain such an objection.

5. *No violation of the Fifth Amendment.*—The court below has emphasized the claim that the radio programs are an invasion of constitutional rights of privacy of the passengers. This claim is that no matter how much Capital Transit may wish to use radio in its vehicles as part of its service to its passengers and as a source of income, no matter how much the great majority of its passengers may desire radio in those vehicles, and however positively the Commission, on substantial evidence,

---

[9] See generally, Shipley, Some Constitutional Aspects of Transit Radio, 11 F. C. Bar J. 150.

The Communications Act of 1934, 48 Stat. 1064 *et seq.*, as amended, 47 U. S. C. § 151 *et seq.*, has been interpreted by the Federal Communications Commission as imposing upon each licensee the duty of fair presentation of news and controversial issues. F. C. C. Report on Editorializing by Licensees, 1 Pike & Fischer Radio Regulation 91:201 (1949).

may conclude that such use of radio does not interfere with the convenience, comfort and safety of the service but tends to improve it, yet if one passenger objects to the programs as an invasion of his constitutional right of privacy, the use of radio on the vehicles must be discontinued. This position wrongly assumes that the Fifth Amendment secures to each passenger on a public vehicle regulated by the Federal Government a right of privacy substantially equal to the privacy to which he is entitled in his own home. However complete his right of privacy may be at home, it is substantially limited by the rights of others when its possessor travels on a public thoroughfare or rides in a public conveyance. Streetcars and busses are subject to the immediate control of their owner and operator and, by virtue of their dedication to public service, they are for the common use of all of their passengers. The Federal Government in its regulation of them is not only entitled, but is required, to take into consideration the interests of all concerned.

In a public vehicle there are mutual limitations upon the conduct of everyone, including the vehicle owner. These conflicting demands limit policies on such matters as operating schedules and the location of car or bus stops, as well as policies relating to the desirability or nature of radio programs in the vehicles. Legislation prohibiting the making of artifically amplified raucous sounds in public places has been upheld. *Kovacs* v. *Cooper,* 336 U. S. 77.[10] Conversely, where a regulatory body has jurisdiction, it will be sustained in its protection of activities in public places when those activities do not interfere with the general public convenience, comfort

---

[10] The interest of some unwilling listeners was there held to justify some limitation on the freedom of others to amplify their speech. The decision, however, did not indicate that it would violate constitutional rights of privacy or due process for the city to authorize some use of sound trucks and amplifiers in public places.

and safety. The supervision of such practices by the Public Utilities Commission in the manner prescribed in the District of Columbia meets the requirements both of substantive and procedural due process when it is not arbitrarily and capriciously exercised.

The contention of Pollak and Martin would permit an objector, with a status no different from that of other passengers, to override not only the preference of the majority of the passengers but also the considered judgment of the federally authorized Public Utilities Commission, after notice, investigation and public hearings, and upon a record reasonably justifying its conclusion that the policy of the owner and operator did not interfere with public convenience, comfort and safety but tended, in general, to improve the utility service.

We do not agree with that contention. The protection afforded to the liberty of the individual by the Fifth Amendment against the action of the Federal Government does not go that far. The liberty of each individual in a public vehicle or public place is subject to reasonable limitations in relation to the rights of others.

This Court expresses no opinion as to the desirability of radio programs in public vehicles. In this case that is a matter for decision between Capital Transit, the public and the Public Utilities Commission. The situation is not unlike that which arises when a utility makes a change in its running schedules or in the locations of its stops in the interests of the majority of the passengers but against the vigorous protests of the few who are inconvenienced by the change.

The court below expressly refrained from passing on the constitutionality of the receipt and amplification in public vehicles of occasional broadcasts of music alone. Pollak and Martin, in No. 295, contend that broadcasts even so limited are unconstitutional. However, in view of our holding that the programs before us, containing

music, commercial advertising and other announcements are constitutionally permissible, it is clear that programs limited to a like type of music alone would not be less so.

The judgment of the Court of Appeals, accordingly, is reversed and the case is remanded to the District Court.

*Reversed.*

MR. JUSTICE FRANKFURTER, for reasons stated by him, took no part in the consideration or decision of this case.

Separate opinion of MR. JUSTICE BLACK.

I concur in the Court's holding that this record shows no violation of the Due Process Clause of the Fifth Amendment. I also agree that Capital Transit's musical programs have not violated the First Amendment. I am of the opinion, however, that subjecting Capital Transit's passengers to the broadcasting of news, public speeches, views, or propaganda of any kind and by any means would violate the First Amendment. To the extent, if any, that the Court holds the contrary, I dissent.

MR. JUSTICE FRANKFURTER.

The judicial process demands that a judge move within the framework of relevant legal rules and the covenanted modes of thought for ascertaining them. He must think dispassionately and submerge private feeling on every aspect of a case. There is a good deal of shallow talk that the judicial robe does not change the man within it. It does. The fact is that on the whole judges do lay aside private views in discharging their judicial functions. This is achieved through training, professional habits, self-discipline and that fortunate alchemy by which men are loyal to the obligation with which they are entrusted. But it is also true that reason cannot control the subconscious influence of feelings of which it is unaware. When there is ground for believing that such unconscious feelings may operate in the ultimate judg-

ment, or may not unfairly lead others to believe they are operating, judges recuse themselves. They do not sit in judgment. They do this for a variety of reasons. The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact.

This case for me presents such a situation. My feelings are so strongly engaged as a victim of the practice in controversy that I had better not participate in judicial judgment upon it. I am explicit as to the reason for my non-participation in this case because I have for some time been of the view that it is desirable to state why one takes himself out of a case.

MR. JUSTICE DOUGLAS, dissenting.

This is a case of first impression. There are no precedents to construe; no principles previously expounded to apply. We write on a clean slate.

The case comes down to the meaning of "liberty" as used in the Fifth Amendment. Liberty in the constitutional sense must mean more than freedom from unlawful governmental restraint; it must include privacy as well, if it is to be a repository of freedom. The right to be let alone is indeed the beginning of all freedom. Part of our claim to privacy is in the prohibition of the Fourth Amendment against unreasonable searches and seizures. It gives the guarantee that a man's home is his castle beyond invasion either by inquisitive or by officious people. A man loses that privacy of course when he goes upon the streets or enters public places. But even in his activities outside the home he has immunities from controls bearing on privacy. He may not be compelled against his will to attend a religious service; he may not be forced to make an affirmation or observe a ritual that violates his scruples; he may not be made to accept one religious, political, or philosophical creed as against another. Freedom of religion and freedom of

speech guaranteed by the First Amendment give more than the privilege to worship, to write, to speak as one chooses; they give freedom not to do nor to act as the government chooses. The First Amendment in its respect for the conscience of the individual honors the sanctity of thought and belief. To think as one chooses, to believe what one wishes are important aspects of the constitutional right to be let alone.

If we remembered this lesson taught by the First Amendment, I do not believe we would construe "liberty" within the meaning of the Fifth Amendment as narrowly as the Court does. The present case involves a form of coercion to make people listen. The listeners are of course in a public place; they are on streetcars traveling to and from home. In one sense it can be said that those who ride the streetcars do so voluntarily. Yet in a practical sense they are forced to ride, since this mode of transportation is today essential for many thousands. Compulsion which comes from circumstances can be as real as compulsion which comes from a command.

The streetcar audience is a captive audience. It is there as a matter of necessity, not of choice. One who is in a public vehicle may not of course complain of the noise of the crowd and the babble of tongues. One who enters any public place sacrifices some of his privacy. My protest is against the invasion of his privacy over and beyond the risks of travel.

The government may use the radio (or television) on public vehicles for many purposes. Today it may use it for a cultural end. Tomorrow it may use it for political purposes. So far as the right of privacy is concerned the purpose makes no difference. The music selected by one bureaucrat may be as offensive to some as it is soothing to others. The news commentator chosen to report on the events of the day may give overtones to the news that please the bureau head but which rile the streetcar

captive audience. The political philosophy which one radio speaker exudes may be thought by the official who makes up the streetcar programs to be best for the welfare of the people. But the man who listens to it on his way to work in the morning and on his way home at night may think it marks the destruction of the Republic.

One who tunes in on an offensive program at home can turn it off or tune in another station, as he wishes. One who hears disquieting or unpleasant programs in public places, such as restaurants, can get up and leave. But the man on the streetcar has no choice but to sit and listen, or perhaps to sit and to try *not* to listen.

When we force people to listen to another's ideas, we give the propagandist a powerful weapon. Today it is a business enterprise working out a radio program under the auspices of government. Tomorrow it may be a dominant political or religious group. Today the purpose is benign; there is no invidious cast to the programs. But the vice is inherent in the system. Once privacy is invaded, privacy is gone. Once a man is forced to submit to one type of radio program, he can be forced to submit to another. It may be but a short step from a cultural program to a political program.

If liberty is to flourish, government should never be allowed to force people to listen to any radio program. The right of privacy should include the right to pick and choose from competing entertainments, competing propaganda, competing political philosophies. If people are let alone in those choices, the right of privacy will pay dividends in character and integrity. The strength of our system is in the dignity, the resourcefulness, and the independence of our people. Our confidence is in their ability as individuals to make the wisest choice. That system cannot flourish if regimentation takes hold. The right of privacy, today violated, is a powerful deterrent to any one who would control men's minds.