Eugene R. BROWN et al., Appellees,

v.

D. C. TRANSIT SYSTEM, INC., et al., Appellants.

No. 73–2089.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 26, 1974.

Decided Feb. 28, 1975.

Certiorari Denied Oct. 6, 1975. See 96 S.Ct. 121.

Harold Smith, Washington, D. C., for appellant, D. C. Transit System, Inc.

Peter G. Ciano, Washington, D. C., for appellant, Washington Metropolitan Area Transit Authority.

John H. Harman, Silver Spring, Md., for appellees.

Before DANAHER, Senior Circuit Judge, and LEVENTHAL and WILKEY, Circuit Judges.

DANAHER, Senior Circuit Judge:

The above-named appellees (hereinafter, "Plaintiffs") were bus drivers in the employ of D. C. Transit System, Inc. (hereinafter, "Transit") whose services were terminated, as the district judge found, "because of failure to conform [1] their facial hair to the styling required by D. C. Transit Regulation # 70–67." [2] He concluded after consid-

---

1. "Their non-conformity consisted of sideburns extending approximately two inches below their earlobes and . . . in 'mutton chop' fashion toward their mouths," the judge found.

2. D. C. Transit Regulation # 70–67 states:

(1) Employees must be clean and neat and operators must be clothed in full regulation uniform.

(2) Employees must be clean shaven (exceptions: a moustache may be worn provided that it is neatly trimmed, follows the contour of the upper lip and does not exceed to a point lower than a horizontal line projected from the bottom of the lower lip; (a) a dickey (slang), a patch of hair worn just below the center of the lower lip, may be worn provided that it does not exceed ½" in width, length and protrusion).

eration of cross-motions for summary judgment that Transit's Regulation and the discharge of the Plaintiffs were in violation of their Fifth Amendment rights. In response to a motion of D. C. Transit, the district judge issued an order which found that the court's Fifth Amendment ruling "involves a controlling question of law as to which there is substantial ground for difference of opinion," and that an appeal from it may materially advance termination of the litigation, see 28 U.S.C. § 1292(b). The corporate defendants [3] have brought this appeal from the partial summary judgment granted Plaintiffs. We have accepted jurisdiction over this interlocutory appeal. The respective parties on brief agree that the Fifth Amendment determination presents the sole issue before us. We reverse and remand with directions that judgment be entered in favor of the appellants and that Plaintiffs' complaint be dismissed.

I

The district judge concluded that Plaintiffs' claim based on statutory grounds had failed. Specifically he ruled that "Regulation # 70–67 does not discriminate against persons because of their race or sex and provides no basis for a claim cognizable under 42 U.S.C. § 1981 or § 2000e–2." Moreover, since the District of Columbia is not a "State or Territory" within the meaning of 42 U.S.C. § 1983, the Plaintiffs "are entitled to no relief under that statute," citing District of Columbia v. Carter, 409 U.S.

418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973).[4] Succinctly the district judge thus ruled before turning to the Plaintiffs' claim of denial of substantive due process under the Fifth Amendment.

Plaintiffs had claimed that Regulation No. 70–67 would have forced them to modify their facial hair style, and so was an "extreme and gross suppression of them as black men and [was] a badge of slavery" depriving them "of their racial identity and virility." But there were 1800 employees, 1100 of whom were black, all others were white, indeed there were three women bus drivers. At the time the Plaintiffs were terminated, the regulation had been invoked against certain white drivers as well, at least one of whom had thereupon brought his facial hair style into conformity. The district judge specifically had found that there was no discrimination "against persons because of their race or sex," text *supra.*

Even so, as the judge initiated his inquiry, his opinion epitomized his premise thus:

> The right of an adult to wear his hair in the fashion of his own choosing . . . has been identified as an aspect of liberty which is protected from unwarranted government interference.

II

It is clear enough that the district judge perceived Transit as "operating under an exclusive franchise" which "could have no concern" as to how its bus drivers might wear their hair "as an

---

(3) Hair must be trimmed neatly. It must not be allowed to cover the ears or extend over the neck collar.
(4) Sideburns must be trimmed neatly and are not to exceed a point lower than ½" below the earlob.
(5) Beards, goatees and any item not covered above are not permissible.

3. D. C. Transit System, Inc., was a privately owned corporation organized under legislation appertaining to the District of Columbia; Washington Metropolitan Area Transit Authority (herein, WMATA) was' created pursuant to an interstate compact, authorized by Pub.L. 89–774, 80 Stat. 1324, 1966, and

reached the District, and certain areas in Virginia and Maryland. WMATA acquired certain assets of D. C. Transit as of January 14, 1973, and was not added as a party to this action until March 12, 1973.

Transit terminated the service of appellee Brown on September 22, 1971, and of appellee Gray on October 7, 1971.

4. See Fagan v. National Cash Register Co., 157 U.S.App.D.C. 15, 481 F.2d 1115 (1973); cf. Dodge v. Giant Food, Inc., 160 U.S.App. D.C. 9, 488 F.2d 1333 (1973); Boyce v. Safeway Stores, Inc., 351 F.Supp. 402 (D.D.C. 1972); Baker v. California Land Title Co., 507 F.2d 895 (CA9, 1974).

aspect of liberty which is protected from unwarranted government interference." The judge saw Transit's grooming regulation as an "interference" with Plaintiffs' rights. In that context, the trier viewed his problem, apparently, as one of balancing the respective interests of the Plaintiffs in contrast to the position of Transit.

In the first place, that Transit was operating under an "exclusive franchise" surely lacks controlling significance. It was a private corporation, privately funded, and so had no different status as such an entity than is possessed by any corporation organized under the laws of the District of Columbia or one created pursuant to a special act of Congress. Transit's status as a legal entity was no different from that of the National Cash Register Company or that of Giant Food, Incorporated, or Safeway Stores, Incorporated, all heretofore involved in varying respects.[5] True it is that Transit was subject to regulation by the Public Utilities Commission, but that fact, again, is immaterial here. For one thing, the Commission had exercised no jurisdiction over this subject matter. Moreover, there had not even been an application for relief presented to the Commission so that it might consider whether it could or should exercise jurisdiction.

We have given consideration to Public Utilities Comm'n v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), reversing this court's position as announced in 89 U.S.App.D.C. 94, 191 F.2d 450 (1951). Capital Transit, the utility there involved, had a charter for the operation of a public transportation system on the streets of Washington, to be sure. In addition, however, the Commission had ordered an investigation of, and after hearings, had rejected Pollak's complaint against the exposure of the captive audience, the riding public, to the utility's broadcasting. The Court pointed out that the First and Fifth Amendments were applicable to and restrictive only of "the Federal Government[6] and not private persons," id. 343 U.S. 461, 72 S.Ct. 821.

Those Amendments nevertheless were considered because the Court saw "a sufficiently close relation between the Federal Government and the radio service," id., 343 U.S. at 462, 72 S.Ct. at 820, as to require scrutiny. It was noted that the Public Utilities Commission, pursuant to protests against the utility's radio program, had "ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby." Id., 343 U.S. at 462, 72 S.Ct.

**5.** See note 4, *supra.*

Compare the Court's observations as to the status of the utility in Jackson v. Metropolitan Edison Company, 419 U.S. 345, 351–358, 95 S.Ct. 449, 454–57, 42 L.Ed.2d 477 (1974), as related to other Pennsylvania corporations.

**6.** The Pollak Court noted that the grant of a monopoly to a private entity imposed no obligation on the State, even though the utility was bound to furnish services to the public. "Streetcars and busses are subject to the immediate control of their owner and operator and, by virtue of their dedication to public service, they are for the common use of all of their passengers." 343 U.S. at 464, 72 S.Ct. at 821.

Pollak as a passenger had sought to override the possible preference of other transit users and even the considered judgment of the federally authorized Public Utilities Commission. "The protection afforded to the liberty of the individual by the Fifth Amendment . . . does not go that far," id., 343 U.S. at 465, 72 S.Ct. at 822. The Court reasoned that the utility's practice against which Pollak had contended was not unlike the result of other management decisions as when a utility makes a change in its running schedules or in the location of its stops in the interests of a majority of its riders, even against the vigorous protests of the few who may be inconvenienced by the company-ordered changes. In short, the utility's action was "constitutionally permissible," id., 343 U.S. at 466, 72 S.Ct. at 813. Mr. Justice Black, concurring, observed that the "record shows no violation of the Due Process Clause of the Fifth Amendment." Id., 343 U.S. at 466, 72 S.Ct. at 822.

at 820. In short, under the circumstances developed in *Pollak*, the Court concluded that the Commission's action had been consistent with its discretion to act in the overall public interest.

The Court re-examined *Pollak, supra*, in Jackson v. Metropolitan Edison Company, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Rejecting the claim that *Jackson* presented an instance of "state action", the Court recognized that there often is a close question as to whether particular action is "private" or "state action." Noting that the company was a privately owned public utility, the fact that it was operating under a certificate of public convenience and necessity issued by the Pennsylvania Public Utilities Commission,[7] was not controlling. That a business is subject even to extensive state regulation does not by itself convert its action, vis-a-vis its customers, into that of the State.

Here Transit at the time of the discharge of these Plaintiffs was in precisely the same situation as the utility named in *Jackson*. Although it was heavily regulated, its actions were not, *ipso facto*, "state action." The Federal Government had not claimed control over the management decision in the adoption of the challenged regulation. The unreported opinion of the district judge noted that Regulation # 70–67 had been "adopted in the interest of morale of employees [and] so as to be properly presentable to the public and in the interest of safety . . .". He then reasoned that Transit's "legitimate interest" in requiring its employees to be "properly presentable to the public" was

limited to situations which would "affect the conduct of its business." He thus would superimpose the decision of a federal court upon a prerogative of Transit's management. In short, the district judge simply would have denied the employer's right to prescribe reasonable grooming regulations for its employees in their constant contact with the public.

■ Of course individual citizens have a constitutional right to wear beards, sideburns and mustaches in any form and to any length they may choose. But that is not a right protected by the Federal Government, by statute or otherwise, in a situation where a private employer has prescribed regulations governing the grooming of its employees while in that employer's service. The wearing of a uniform, the type of uniform, the requirement of hirsute conformity applicable to whites and blacks alike, are simply non-discriminatory conditions of employment falling within the ambit of managerial decision to promote the best interests of its business.

Heretofore we have summed up the problem in terms of *private* employment thus:

But equally it seems obvious to us, that one seeking an employment opportunity as in *our* situation where hair length readily can be changed, may be required to conform to reasonable grooming standards designed to further the employing company's interest by which that very opportunity is provided. There is no suggestion that the company regulation is pretextual or that it has been derived other-

---

7. We can readily realize that such an isolated fact is not finally determinative. Considering such a determination to present a close question, Judge Friendly sagely observed that

determination of government action in such cases as this hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct, and the value of preserving a private sector free from the constitutional requirements applicable to government institutions. Wahba v. New

York University, 492 F.2d 96, 102 (CA 2 1974).

In Jackson, text *supra*, the Court stated the test thus:

[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. . . . *Id.*, 419 U.S. at 351, 95 S.Ct. at 453.

wise than in complete good faith.[8] (Emphasis in original)

We are aware that Transit may be distinguishable from a private employer who has extensive private competition and adopts grooming standards in the interest of keeping up with or gaining ground on that competition.[9] But even a public utility with monopoly or quasi-monopoly status has an interest in consumer acceptance of its services. A utility's grooming regulation governing its employees does not have the nexus with the state necessary for its classification as "state action" subject to due process restraints where, as here, there has been no involvement whatever of an agency of government, federal or "state." We find here no order, no investigation and hearing, not even an application to the agency to determine whether it could or should consider the possibility that some element of the public interest was adversely affected by the company's regulation.

■ We are satisfied that the district judge correctly concluded that Plaintiffs were entitled to no relief under 42 U.S.C. §§ 1981, 1983 or 2000e–2.[10] We are equally confident that there has been no "state action," such as is essential to establish a claim of denial of due process under the Fifth Amendment. Accordingly, on this aspect of the case, we will reverse and remand with directions that judgment be entered in favor of the appellants and that Plaintiffs' complaint be dismissed.

Reversed and remanded.

---

8. Fagan v. National Cash Register Co., *supra* note 4, 157 U.S.App.D.C. at 25, 481 F.2d at 1125. *See also* Willingham v. Macon Telegraph Publishing Company, 352 F.Supp. 1018 (M.D.Ga.1972), reversed, 482 F.2d 535 (CA 5 1973), in turn reversed *en banc* 11–4, 507 F.2d 1084 (CA 5 1975).

9. Fagan v. National Cash Register Co., *supra,* 157 U.S.App.D.C. at 25, 481 F.2d at 1125: "Good grooming regulations reflect a company's policy in our highly competitive business environment."

Yet other cases treating of differing situations simply are not decisive as we hold that our case has presented no denial of due process under the Fifth Amendment.

10. We here have not been concerned with the reasonableness *vel non* of school hair regulations or even with other situations involving "state" action. The district judge, however, had cited without specific application, certain cases, now mentioned only because we have considered all of them. But, we take as an example, his citation of the opinion of Mr. Justice Douglas who alone dissented from the denial of *certiorari* in Olff v. East Side Union High School District, 404 U.S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (1972), where he wrote in part

It seems incredible that under our federalism a State can deny a student education in its public school system unless his hair style comports with the standards of the school board.

The opinion of the Ninth Circuit in the companion case of King v. Saddleback Junior College District, 445 F.2d 932, 940 (1971) had said

We do not believe that the plaintiffs have established the existence of any substantial constitutional right which is in these two instances being infringed.

Again the opinion below had cited Karr v. Schmidt, 460 F.2d 609 (1972), where the Fifth Circuit sitting *en banc* (after quoting Mr. Justice Black at 611, *and see* his memorandum at 401 U.S. 1201, 1202, 91 S.Ct. 592, 27 L.Ed.2d 797 (1971)) announced as a *per se* rule that the district courts were to dismiss a complaint which had merely alleged the constitutional invalidity of a high school hair and grooming regulation.

The Plaintiffs here had cited, as in the district court, Lindquist v. City of Coral Gables, 323 F.Supp. 1161 (S.D.Fla.1971), where the plaintiff had relied in part upon 42 U.S.C. §§ 1981 and 1983. On the other hand, in another "sideburns" situation, Yarbrough v. City of Jacksonville, 363 F.Supp. 1176 (M.D. Fla.1973), Judge Scott, 363 F.Supp. at 1180, explicitly refused to follow Lindquist v. City of Coral Gables, *supra.*

We are thoroughly aware of and have carefully considered yet other "state action" cases, not applicable here, such as Stradley v. Andersen, 478 F.2d 188, 191 (CA 8 1973); Dwen v. Barry, Commissioner, 483 F.2d 1126 (CA 2 1973), and Friedman v. Froehlke, 470 F.2d 1351 (1 CA 1972).