OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of Ohio are
being transmitted electronically beginning May 27, 1992, pursuant to
a pilot project implemented by Chief Justice Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S. Kobalka,
Reporter, or Deborah J. Barrett, Administrative Assistant.  Tel.:
(614) 466-4961; in Ohio 1-800-826-9010.  Your comments on this pilot
project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the full
texts of the opinions after they have been released electronically
to the public.  The reader is therefore advised to check the bound
volumes of Ohio St.3d published by West Publishing Company for the
final versions of these opinions.  The advance sheets to Ohio St.3d
will also contain the volume and page numbers where the opinions
will be found in the bound volumes of the Ohio Official Reports.

Ohio Domestic Violence Network et al., Appellants, v. Public
Utilities Commission of Ohio et al., Appellees.
[Cite as Ohio Domestic Violence Network v. Pub. Util. Comm.
(1994),     Ohio St.3d     .]
Public Utilities Commission -- Having never been made a party to the
     proceeding in which the commission considered and approved Call
     Screening and Distinctive Ringing, the Office of Consumers'
     Counsel is without standing to appeal that order to Supreme
     Court -- Office of Consumers' Counsel has standing to appeal
     the commission's orders approving Caller ID and Automatic
     Callback -- Commission's approval of Advance Custom Calling
     services under the standard regulatory process provided by R.C.
     4909.18 is not sufficient to constitute state action under the
     Fourteenth Amendment.
     (Nos. 93-1050, 93-1453, 93-1515 and 93-1516 -- Submitted April
26, 1994 - - Decided September 21, 1994.)
     Appeal from the Public Utilities Commission of Ohio, Nos.
92-1916-TP-ATA, 93-343-TP-ATA and 93-344-TP-ATA.
     These consolidated appeals involve appellee Public Utilities
Commission of Ohio's approval of intervening appellee Ohio Bell
Telephone Company's ("Ohio Bell") applications to offer various new
Advanced Custom Calling ("CLASS") services, made possible with the
introduction of new signaling technology (Common Channel Signaling
and Signaling System 7 ["CCS/SS7"]).  Conventional technology
initially sends signals carrying both speech and call setup
information.  In contrast, the CCS/SS7 network first makes the setup
(or connection) between the calling party and call recipient.  When
the calling party places the call, it is transmitted to the
originating central office switch which creates an Initial Address
Message ("IAM"), containing, inter alia, the calling and receiving
parties' telephone numbers.  The call is then transmitted to the
terminating central office, which rings the call recipient's
number.  The terminating office signals the originating central
office that the call has been set up.  When the originating office
receives the message, the voice path is established.
     Each of the CLASS offerings uses this technology in a different
way:
     Caller ID.  The central office obtains the calling party's
number from switch memory if both parties are served by the same
office, or from the IAM if both parties are served by different

offices.  The calling party's number is then displayed on the call recipient's display terminal during the silence between the first and second rings.  The number can be stored within the Caller ID display device for later retrieval if the call recipient is not present to answer.

Automatic Callback.  The central office obtains the calling party's number from the IAM and places it in a memory slot associated with the call recipient's telephone line.  Upon the dialing of a special code from the recipient's telephone, a signal is sent to the originating central office, which sets up a return call to the calling party.  The "callback" must be placed before receiving another call.  The telephone number of the calling party is not revealed to the call recipient through this process, but in some circumstances may be revealed through an optional billing procedure that contains call detail.

Call Screening (a.k.a. Call Reject).  Call Screening allows the customer to refuse future calls from certain telephone numbers.  A customer may enter known telephone numbers onto a restricted list or, after a call is received, add that particular number to the restricted list by dialing an access code.  When a call is placed to a Call Screening customer, the central office switch (using the IAM) determines if the calling number matches the number on the restricted list.  If so, the call is routed to an announcement that informs the calling party that the call screening customer is not accepting telephone calls at that time.  This process does not reveal the telephone number of the calling party; however, disclosure occurs through a voiceback feature used when the customer wishes to "validate" the list.

Distinctive Ringing.  This service provides the customers with the ability to build and maintain lists of up to ten telephone numbers in order to differentiate their calls from all other callers.  When receiving a call from a number on such a list, customers receive a different and distinctive ring on their telephones.

The commission's order has a lengthy procedural history.  Ohio Bell initially filed applications in 1990 to offer Caller ID (PUCO No. 90-467-TP-ATA) and Automatic Callback (PUCO No. 90-471-TP-ATA).  The applications were filed under R.C. 4909.18, which provides that if the "application is not for an increase in any rate ***, the commission may permit the filing of the schedule proposed in the application and fix the time when such schedule shall take effect.  If it appears to the commission that the proposals in the application may be unjust or unreasonable, the commission shall set the matter for hearing and shall give notice of such hearing ***."  Applications for new services are considered to be applications not for an increase in rates.  See Cookson Pottery v. Pub. Util. Comm. (1954), 161 Ohio St. 498, 53 O.O. 374, 120 N.E.2d 98.

The commission found that the applications may be unjust or unreasonable and consolidated the cases for hearing.  Ohio Domestic Violence Network ("ODVN") and the Office of Consumers' Counsel ("OCC") were permitted to intervene, and an evidentiary hearing was held.  In its March 26, 1992 order, the commission held that the applications were unjust and unreasonable; however, it found that they could be made just and reasonable if Ohio Bell revised its applications as proposed in the commission's order.  The revisions ordered included providing the calling party with the ability to "block" disclosure of the telephone number under Caller ID and to

prevent disclosure of the calling party's number on the called party's bill under Automatic Callback. Specifically, the commission found that Ohio Bell should offer free per-call blocking to all subscribers, by which disclosure of the calling party's number could be prevented by dialing *67 (for touch-tone service) or 1167 (for rotary service). Per-line blocking was to be made available to all non-published subscribers at no additional charge, and to all other customers upon a subscription basis. Finding that Caller ID, Call Screening, and Call Trace1 were complementary services, the commission also made the offering of Caller ID contingent upon the contemporaneous offering of Call Trace and Call Screening, consistent with OCC's position that those services should also be offered as alternatives.

On rehearing, the commission modified the blocking requirements for Caller ID, eliminating mandatory per-line blocking for non-published customers, provided the company made satisfactory efforts to educate and notify its customers about the services. It also released the company from the obligation to develop a means to prevent disclosure of the calling party's number before offering Automatic Callback. Authority to provide the services was still contingent upon the filing of a revised application in which Ohio Bell would have to agree to develop as quickly as possible a means to prevent number disclosure. Further, Ohio Bell was required to make reports of its progress to the commission, and to implement a ninety-day education period for its subscribers. Significantly, implementation of the services was not ordered, but remained discretionary, and Ohio Bell was allowed to submit alternatives to the commission's suggested modifications.

Ohio Bell did not file the revised applications and ODVN appealed the commission's order on July 20, 1992. We dismissed that appeal in Ohio Domestic Violence Network v. Pub. Util. Comm. (1992), 65 Ohio St.3d 438, 605 N.E.2d 13, finding that the order did not affect ODVN's substantial rights, that the order was not final and appealable as to ODVN, and thus that ODVN lacked standing to bring the appeal.

Ohio Bell subsequently filed new applications to offer Caller ID (PUCO No. 92-1916-TP-ATA) and Automatic Callback (PUCO No. 93-343-TP-ATA), as well as for authority to offer two additional CLASS services, Call Screening and Distinctive Ringing (PUCO No. 93-344-TP-ATA). Caller ID, Call Screening, and Distinctive Ringing were proposed with universal free per-call blocking and with free per-line blocking to, inter alia, domestic violence shelters and law enforcement agencies. No specific blocking features were proposed for Automatic Callback.

ODVN and OCC sought to intervene in each of the cases; however, the commission approved the applications under R.C. 4909.18 without hearing and further found that, absent the need for hearing, the motions to intervene were rendered moot. However, although the commission denied intervention and ODVN's motion to consolidate the new applications with the 1990 cases, it took "administrative notice" of the record and determinations made therein, in considering appellants' objections to the 1992 Caller ID and 1993 Automatic Callback cases and, ultimately, in approving the applications. The commission did not take administrative notice of the record in the 1990 cases in approving Call Screening and Distinctive Ringing (PUCO No. 93-1515-TP-ATA).

ODVN appeals the commission's approval of Automatic Callback

(case No. 93-1050). OCC appeals the commission's approval of Automatic Callback (case No. 93-1453), Caller ID (case No. 93-1516), and Call Screening and Distinctive Ringing (case No. 93-1515). Because the appeals involve essentially the same underlying facts and issues, they were consolidated by this court on March 2, 1994. Those issues include whether appellants were properly denied intervention in the individual 1992 and 1993 cases, whether the CLASS services violate the state and federal constitutions, and whether the services violate the Electronic Communications Privacy Act.

Hahn Loeser & Parks, Janine L. Migden, Maureen R. Grady, Randy J. Hart and Patricia A. Nussle; and Kathryn Bamberger, for appellant in case No. 93-1050, Ohio Domestic Violence Network.

Robert S. Tongren, Consumers' Counsel, Werner L. Margard III, David C. Bergmann and Yvonne T. Ranft, Associate Consumers' Counsel, for appellant in case Nos. 93-1453, 93-1515 and 93-1516, Office of Consumers' Counsel.

Lee Fisher, Attorney General, James B. Gainer, Anne E. Henkener and Steven T. Nourse, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

William H. Hunt, Charles S. Rawlings and Jon F. Kelly, for intervening appellee Ohio Bell Telephone Company.

Per Curiam. For the following reasons, we affirm the orders of the commission.

I

STANDING

As a threshold matter, we must consider whether, having been denied intervention in the 1992 and 1993 cases, appellants have standing to appeal the commission's orders authorizing Ohio Bell to offer the CLASS services. R.C. 4903.13 requires a person to have been a party in commission proceedings to appeal a commission order. See Communications Workers of Am. v. Pub. Util. Comm. (1979), 57 Ohio St.2d 76, 11 O.O. 3d 244, 387 N.E.2d 230, and Harrison v. Pub. Util. Comm. (1938), 134 Ohio St. 346, 12 O.O. 316, 16 N.E.2d 943.

Appellants argue that the commission was compelled to grant them intervention under R.C. 4903.221.2 That statute, however, clearly contemplates intervention in quasi-judicial proceedings, characterized by notice, hearing, and the making of an evidentiary record. Since the commission did not exercise its discretion to hold a hearing on applications for new services under R.C. 4909.18, there is no right to intervene. Intervention in such circumstances would defeat the General Assembly's apparent intent that new services, which in the discretion of the commission appear to be just and reasonable, be offered to the public without regulatory delay. Under R.C. Title 49, an aggrieved person's recourse is through the complaint procedure provided in R.C. 4905.26. Ohio Bell Tel. Co. v. Pub. Util. Comm. (1969), 17 Ohio St.2d 45, 48, 46 O.O. 2d 264, 266, 245 N.E.2d 351, 353. We find that, having never been made a party to the proceeding in which the commission considered and approved Call Screening and Distinctive Ringing, OCC is without standing to appeal that order to this court. Accordingly, we dismiss OCC's appeal in case No. 93-1515.

However, we reach a different conclusion as to the commission's orders approving Caller ID and Automatic Callback. As stated above,

the commission adopted the record made in the 1991 proceeding, to which appellants were made parties, and used it as the basis to address appellants' objections in the instant case and, ultimately, to approve the services in the 1992 and 1993 orders. We find that, by its actions, the commission effectively consolidated the two proceedings, that appellants should be deemed parties to the 1992 and 1993 orders, and that they have standing to appeal the orders approving Caller ID and Automatic Callback.

## II
## CONSTITUTIONAL CLAIMS
### A
### State Action

Appellants argue that the CLASS services violate privacy rights guaranteed by the First, Fourth, and Fourteenth Amendments to the United States Constitution. Because these constitutional provisions protect individuals against deprivation of rights by the state, we must first determine whether the commission's approval of the services is sufficient to constitute "state action" under the Fourteenth Amendment, which incorporates and applies to the states the First and Fourth Amendments. Griswold v. Connecticut (1965), 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed.2d 510, Mapp v. Ohio (1961), 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Jackson v. Metro. Edison Co. (1974), 419 U.S. 345, 349-350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 483. See, also, Moose Lodge No. 107 v. Irvis (1972), 407 U.S. 163, 177, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627, 639-640.

Appellants rely on Pub. Util. Comm. of D.C. v. Pollak (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed.2d 1068, for the proposition that the commission's election to hold a formal hearing on Ohio Bell's applications and its subsequent approval of the CLASS offerings provides the requisite nexus for state action. We disagree.

In Jackson v. Metro. Edison Co., supra, the Supreme Court questioned the Pollak decision, stating that it was unclear whether state action had actually been found or merely assumed for purposes of the constitutional analysis. 419 U.S. at 356, 95 S.Ct. at 456, 42 L.Ed.2d at 487. Refusing to find state action where a utility had terminated service for nonpayment pursuant to a tariff approved by the Pennsylvania Public Utility Commission, the court stated:

"The nature of governmental regulation of private utilities is such that a utility may frequently be required by the state regulatory scheme to obtain approval for practices a business regulated in less detail would be free to institute without any approval from a regulatory body. Approval by a state utility commission of such a request from a regulated utility, where the commission has not put its own weight on the side of the proposed practice by ordering it, does not transmute a practice initiated by the utility and approved by the commission into 'state action.' At most the Commission's failure to overturn this practice amounts to no more than a determination that a Pennsylvania utility was authorized to employ such a practice if it so desired. Respondents' exercise of the choice allowed by state law where the initiative comes from it and not from the State [footnote omitted], does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." Id. at 357, 95 S.Ct. at 456-457, 42 L. Ed. 2d at 487.

The Supreme Court and lower courts have since construed Jackson's state action analysis as focusing upon whether the

government could be held "responsible" for the private conduct; here, the offering of the CLASS services and the resulting alleged privacy intrusions. See Blum v. Yaretsky (1982), 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534, for the proposition that the state action requirement "assure[s] that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains [emphasis sic]," id. at 1004, 102 S. Ct. at 2786, 73 L. Ed. 2d at 546, and citing Jackson for the proposition that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. * * * Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the state responsible for those initiatives under the Fourteenth Amendment." Id., 457 U.S. at 1004-1005, 102 S. Ct. at 2786, 73 L. Ed. 2d at 546-547. Accord Rendell-Baker v. Kohn (1982), 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418.

Citing Blum, lower courts have refused to find state action under statutes similar to R.C. 4909.18, considering the hearing as part of a standard regulatory approval process under which the state does not initiate and is not deemed responsible for the implementation of new tariff offerings. Carlin Communications, Inc. v. S. Bell Tel. & Tel. Co. (C.A. 11, 1986), 802 F.2d 1352 (upholding tariff restrictions on "900" service offerings); S. Bell Tel. & Tel. Co. v. Hamm (1991), 306 S.C. 70, 409 S.E.2d 775 (upholding approval of Caller ID).

Similarly, we do not find that the commission's approval of the CLASS services under the standard regulatory process provided by R.C. 4909.18 is sufficient to constitute state action. The commission did not order Ohio Bell to implement the CLASS offerings; that decision was initiated by and remained with the company throughout these lengthy proceedings. Indeed, our decision dismissing ODVN's appeal of the 1990 case when it was unclear whether Ohio Bell would choose to institute the services under the commission's restrictions emphasizes the private nature of the action. Finding no state action, we find no infringement of appellants' constitutional rights.

B
Privacy Rights

Even assuming that the threshold state action requirement were met, appellants' merit arguments would fare no better. In Smith v. Maryland (1979), 442 U.S. 735, 99 S. Ct. 2577, 61 L.Ed.2d 220, the Supreme Court held that individuals have no reasonable expectation of privacy in a telephone number, and that Fourth Amendment protections do not extend to the installation and use of a pen register to record numbers dialed from a telephone. The court reasoned:

"Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers harbor any general expectation that the numbers they dial will remain secret. *** [E]ven if petitioner did harbor some subjective expectation that the phone numbers he dialed

would remain private, this expectation is not 'one that society is prepared to recognize as reasonable'. Katz v. United States, 389 U.S. [347] at 361 [88 S.Ct. 507, at 516, 19 L.Ed.2d 576 at 588 (1967)]." Id., 442 U.S. at 743, 99 S. Ct. at 2581-2582, 61 L. Ed. 2d at 228-229 (Harlan, J., concurring).

In Hamm, supra, the South Carolina Supreme Court relied on Smith in rejecting a similar constitutional challenge to Caller ID ("The telephone number from which a call is placed [when Caller ID is used], like the phone numbers of the calls placed [when a pen register is used], is numerical information passed through the telephone network, voluntarily transmitted as a result of call placement. Caller ID service simply does not violate any right that rises to the level of constitutional protection." Id., 306 S.C. at 78, 409 S.E. 2d at 780). We find Smith controlling as to appellants' Fourth Amendment claim.3

Appellants also argue that the CLASS offerings violate an independent constitutional right against disclosure of personal information, citing Whalen v. Roe (1977), 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64. See, also, Nixon v. Admr. of Gen. Serv. (1977), 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867. However, implicit in Smith and Hamm is that the mere numerical information conveyed by telephone users is not "personal information" and does not fall within the ambit of Whalen's right against disclosure of personal information, assuming that such right exists. Cf. J.P. v. DeSanti (C.A. 6, 1981), 653 F.2d 1080, 1089 (Whalen created no general right to nondisclosure of private information.).

Moreover, under the balancing test employed in cases that have recognized a general right to informational privacy, we find no constitutional infringement. That test, which traditionally balances the alleged privacy intrusion against the legitimate purpose served by the challenged conduct under an intermediate standard of review, is made more complex in this case, where the privacy interests of both the opponent (calling party) and proponent (call recipient) of the services are affected.4 In this regard, the calling parties' interests result from the ability to ascertain their identity and location via a disclosed telephone number, which in turn creates the potential for embarrassment, reputational injury, or even physical harm. On the other hand, the call recipients have a legitimate interest in avoiding obscene, threatening, and harassing telephone calls, which the CLASS services are promoted as preventing or deterring.

As to Caller ID, we conclude that the interests served by the service would outweigh the threatened privacy intrusions. Significantly, of those comparatively limited instances in which a caller must make a particularly sensitive or potentially embarrassing call, the free per-call and per-line blocking features would safeguard against disclosure. Indeed, a caller who does not activate that feature would be deemed to consent to the disclosure of the telephone number and, thus, could not assert the privacy interests.

As noted previously, Automatic Callback does not itself disclose the number of the calling party and per-line or per-call blocking is not an option. Rather, disclosure of the calling party's telephone number occurs only through indirect means. For disclosure to occur: (1) the call recipient must subscribe to Automatic Callback; (2) the recipient must activate the callback before another call is received; (3) the recipient must subscribe to

a measured local service (which is billed much like long distance calls, e.g., on the basis of number and duration of calls [unlike unlimited flat-rate service]); and (4) the recipient must request bill detailing (the individual listing of such calls on the recipient's bill).5  Under these circumstances, considering the comparatively small percentage of calls that would be subject to disclosure, that even fewer calls would involve embarrassment or potential harm, and that alternative means exist by which to place particularly sensitive calls, we conclude that the interests served by the service outweigh the speculative and remote privacy intrusions.6

III

ELECTRONIC COMMUNICATIONS PRIVACY ACT

Appellants also contend that the CLASS services violate the Electronic Communications Privacy Act ("ECPA"), Chapter 206, Title 18, U.S. Code.  Section 3121, Title 18, U.S. Code provides:

"(a)  In general. -- Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order under section 3123 of this title or under the Foreign Intelligence Surveillance Act of 1978 (50 U.S.C. 1801 et seq.).

"(b) Exception. -- The prohibition of subsection (a) does not apply with respect to the use of a pen register or a trap and trace device by a provider of electronic or wire communication service --

"(1) relating to the operation, maintenance, and testing of a wire or electronic communication service or to the protection of the rights or property of such provider, or to the protection of users of that service from abuse of service or unlawful use of service; or

"(2) to record the fact that a wire or electronic communication was initiated or completed in order to protect such provider, and other provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful or abusive use of service; or

"(3) where the consent of the user of that service has been obtained." (Emphasis added.)

The ECPA defines a "pen register" as a "device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached," and a "trap and trace device" as one "which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted."  Sections 3127(3) and (4), Title 18, U.S. Code.  It is not disputed that the CLASS services operate by trapping and tracing the calling party's number.  At issue is whether the device is used by the provider (Ohio Bell) under Section 3121(b), Title 18, U.S. Code, and, if so, whether the subscriber to the CLASS service provides the requisite consent under Section 3121(b)(3), Title 18, U.S. Code, as found by the commission.

Appellants rely on Barasch v. Pennsylvania Pub. Util. Comm. (1992), 529 Pa. 523, 605 A.2d 1198, in which the Pennsylvania Supreme Court, under state law nearly identical to Section 3121, Title 18, U.S. Code, considered the Caller ID display terminal in the subscribers' possession to be a "trap and trace" device that "captures, displays, and stores for future retrieval the telephone number of the calling party."  Id. at 531, 605 A.2d at 1201.  Other

authority reaches the same conclusion7 that the subscriber is the user, thus prohibiting the service.  However, we find the authority to the contrary more persuasive.8  Specifically, we agree that the Caller ID display unit standing alone is incapable of performing a trap and trace apart from the CCS/SS7 signalling equipment and software necessary to use it, and that it is this equipment that performs the trap and trace.  That fact is made even more apparent when considering the trap and trace of calls through Automatic Callback, which operates only via the new signalling technology, and without a display unit.

As to the issue of consent, the Barasch court rejected Caller ID under a provision of the Pennsylvania Wiretap Act that required consent to any form of interception to be obtained from all parties.  The court found the lack of consent of the calling party to be fatal.9  Barasch is easily distinguishable in that both the federal and Ohio wiretap statutes require only that one party to a communication consent to its interception.  See Section 2511(2)(c), Title 18, U.S. Code; R.C. 2933.53(B)(4).  See, also, Hamm, supra.

Finally, OCC relies on an analysis performed by the Congressional Research Service, supra (fn. 7), which concluded that the term "the user" in the consent exception, as opposed to "a user," required the consent of a single user to the trap and trace of a particular call, and further suggested that every user of the telephone line over time must consent to the placement of the trap and trace device.  This analysis would defeat the general purpose of the exceptions, as recognized by the Congressional Research Service, which was to preserve the legitimate pre-ECPA practices performed by the telephone companies.  We find it inconceivable under that practice that consent was obtained from every person who may use a particular line over time (which would make the exception meaningless), or for every particular call (which would be impossible for calls that were unanswered).

We agree with the analysis of the U.S. Department of Justice that "Chapter 206 contemplates that a trap and trace device will be 'attached' to just one telephone line [,] See 18 U.S.C. {{3123(b)(1)(A), (b)(1)(C), (d)(2), 3124(b)[;] *** that there will be only one 'party with respect to whom the installation and use is to take place[,]' Id. {18 U.S.C. 3124[a], [b])[;] *** [and that] the Caller ID subscriber, is thus the 'user' referred to in section 3121(b)(3)."  (Emphasis sic.)  U.S. Dept. of Justice Memorandum, supra (fn. 8), at 6.

Accordingly, we affirm the commission's finding that a subscriber, by purchasing the CLASS service, consents to the trap and trace, and thus that such services are not prohibited under the ECPA.

## IV
## RATE INCREASE

Appellants argue that the potential for disclosure of a non-published subscriber's number diminishes the level of service to that customer and that, without a concomitant decrease in the charge for a non-published number, such subscribers will suffer an implicit rate increase upon the offerings' approval.  In effect, appellants construe the applications for authority to offer the CLASS services as applications to increase the rates for non-published service under R.C. 4909.18.  Appellants request the court to remand these cases to the commission for notice and hearing on this issue under the procedures set forth in R.C. 4909.19 when an application is for

an increase in rates.  Appellants further request that the commission's orders approving the CLASS offerings be vacated pending the commission's determination on this issue.

Appellants' novel position is without merit.  Ohio Bell simply did not propose to increase the charge for a non-published number. Although the potential effect of the new offerings on the "value" of existing non-published service may be a basis to consider the "reasonableness" of the new CLASS offerings, it does not compel notice and hearing under R.C. 4909.18 and 4909.19.

## V
## OCC'S MISCELLANEOUS ARGUMENTS

Finally, OCC seeks remand of these cases to cure three alleged defects in the 1992 and 1993 orders.  First, it contends that the commission's order violates R.C. 4903.09 by failing to set forth sufficient findings and reasoning to support its conclusion that Caller ID should be approved with flexible pricing.[10]    The commission has traditionally approved flexible pricing only for services it deems to have competitive alternatives.  See Armco, Inc. v. Pub. Util. Comm. (1982), 69 Ohio St.2d 401, 23 O.O.3d 361, 433 N.E.2d 923; In re Comm. Investigation into Regulatory Framework for Telecommunication Services in Ohio, (Apr. 9, 1985), PUCO No. 84-944-TP-COI.  Although the commission found that Caller ID had no competitive alternatives, it nevertheless approved the flexible pricing structure on the basis that subscription to (and termination of)  Caller ID was purely optional.  We conclude that the commission's order minimally satisfies the purpose of R.C. 4903.09, which is to provide this court with sufficient details to enable it to determine how the decision was reached.  Gen. Tel. Co. v. Pub. Util. Comm. (1972), 30 Ohio St.2d 271, 59 O.O.2d 338, 285 N.E.2d 34; MCI Telecommunications Corp. v. Pub. Util. Comm. (1988), 38 Ohio St.3d 266, 270,527 N.E.2d 777, 781.  In that OCC does not contest the reasonableness of the decision, or the general policy of extending the flexible pricing structure to optional, non-basic services, we express no opinion as to that issue.  See Cleveland Elec. Illum. Co. v. Pub. Util. Comm. (1983), 4 Ohio St.3d 107, 110, 4 OBR 355, 358, 447 N.E.2d 746, 749, at fn. 5.  Noting that the overriding concern of such a policy may be the potential for subsidization of the optional service by basic services, we note that that issue can be reached by way of a complaint and rate mechanisms found in R.C. Title 49.

Second, OCC argues that the initial order and entry on rehearing in the 1990 case bind the commission as to the form of blocking and customer education under which Automatic Callback may be offered.  See Consumers' Counsel v. Pub. Util. Comm. (1984), 10 Ohio St.3d 49, 50-51, 10 OBR 312, 313, 461 N.E.2d 303, 304 ("When the commission has made a lawful order, it is bound by certain institutional constraints to justify that change before such order may be changed or modified.").  Under the unique procedural posture of these cases, we are unable to ascribe significant precedential value to the many policy statements made by the commission in the 1990 case, particularly considering that that case merely held that Ohio Bell's applications as proposed were denied, and that Ohio Bell was free to submit revised applications which varied from the commission's suggested modifications.  Moreover, having upheld the commission's approval of the services on the merits, we can find no prejudice by the commission's alleged departure from precedent, or any usefulness to be served by remand for further explanation on

these issues.

Finally, OCC alleges that the commission improperly relied upon the results of a Harris Poll submitted by Ohio Bell after the close of the evidentiary hearing in the 1990 cases.  However, OCC has provided no direct evidence that the commission improperly relied upon the poll, and the commission orders expressly state that it relied solely upon the evidence of record in reaching its determination.  We conclude that OCC has failed in its burden on this issue.

For the foregoing reasons, we affirm the commission's order.

                                        Order affirmed.

Moyer, C.J., A.W. Sweeney, Douglas, Wright, Resnick and F.E. Sweeney, JJ., concur.

Pfeifer, J., dissents in part and concurs in part.

FOOTNOTE
1     Call Trace was also approved in PUCO No. 93-344-TP-ATA, but the commission's determination authorizing that service has not been appealed.
2     R.C. 4903.221 provides:
"Any other person who may be adversely affected by a public utilities commission proceeding may intervene in such proceeding, provided:
"(A) That such other person files a motion to intervene with the commission no later than:
"(1) Any specific deadline established by order of the commission for purposes of a particular proceeding; or, if no such deadline is established;
"(2) Five days prior to the scheduled date of hearing.
"The public utilities commission may, in its discretion, grant motions to intervene which are filed after the deadlines set forth in divisions (A)(1) and (2) of this section for good cause shown.
"(B) That the commission, in ruling upon applications to intervene in its proceedings, shall consider the following criteria:
"(1) The nature and extent of the prospective intervenor's interest;
"(2) The legal position advanced by the prospective intervenor and its probable relation to the merits of the case;
"(3) Whether the intervention by the prospective intervenor will unduly prolong or delay the proceedings;
"(4) Whether the prospective intervenor will significantly contribute to full development and equitable resolution of the factual issues."
3     Appellants also argue that the CLASS offerings violate Section 14, Article I of the Ohio Constitution.  We have recognized that this provision is virtually identical to the Fourth Amendment to the federal Constitution and refuse to impose greater restrictions under it.  See State v. Geraldo (1981), 68 Ohio St.2d 120, 22 O.O. 3d 366, 429 N.E.2d 141; Stone v. Stow (1992), 64 Ohio St.3d 156, 164, 593 N.E.2d 299-300, at fn. 3.
4     See, generally,  Smith, We've Got Your Number! (Is it Constitutional to Give it Out?):  Caller Identification Technology and the Right to Informational Privacy (1989), 37 U.C.L.A. L.Rev. 145.
5     Other options to potential disclosure would include placing the call from another phone, including a pay phone, or placing the call with operator assistance.

6   Appellants also contend that the CLASS offerings violate their privacy rights guaranteed by the First Amendment to the United States Constitution, relying on NAACP v. Alabama (1958), 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488, and contending that disclosure of their "associations" (i.e., with domestic violence shelters) could result in "reprisals" against domestic violence victims.  However, NAACP protects "'freedom of association for the purpose of advancing ideas and airing grievances,'" Whalen, supra at 604, n. 32, 97 S. Ct. at 879, 51 L. Ed. 2d at 76, quoting Bates v. Little Rock (1960), 361 U.S. 516, 523, 80 S. Ct. 412, 416, 42 L. Ed. 2d 480, 485.  Appellants have made no such allegation on this record.]

7   See Congressional Research Service, Caller Identification Telephone Equipment and the Electronic Communications Privacy Act (1989), reprinted in 136 Cong. Rec. E784 (Mar. 22, 1990); North Carolina Dept. of Justice, Memorandum re Caller I.D. Telephone Equipment and Legislation Controlling Trap and Trace Devices (July 17, 1990).

8   See Hamm, supra; Rules and Policies Regarding Calling Number Identification Service -- Caller ID (NPRM), CC Docket No. 91-281, FCC 94-59 (March 29, 1994), Appendix D (U.S. Dept. of Justice Memorandum -- Oct. 23, 1993); 1990 Md. Atty. Gen. Ops. (Oct. 26, 1990) 56.

9   Caller ID was not proposed with blocking, and the court expressly offered no opinion as to the legality of Caller ID with free "per call" blocking.  The Pennsylvania legislature subsequently amended its statutes to permit Caller ID if offered with per-call and per-line blocking.  See 66 Pa. Cons. Stat. Ann. 2906 (1993).

10 Flexible pricing merely sets a minimum and maximum price for the service, and provides the utility with the authority to charge, and change, any price within that range without prior commission approval.

Pfeifer, J.,  dissenting in part and concurring in part.  I respectfully disagree with the majority's analysis of the automatic callback service.

The approval process at issue in this case constituted "state action" for purposes of constitutional analysis.   The United States Supreme Court in Pub. Util. Comm. of D.C. v. Pollak (1952), 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, required "a sufficiently close relation" between a service being offered and government for there to be state action. Id. at 462, 72 S.Ct. at 820, 96 L.Ed. at 1077. Ohio law requires the PUCO to approve the proposed service before it can be offered. R.C. 4909.18.  This review and approval process means that a service, while originating in the private sector, is adopted by the PUCO -- a state organization.  Thus, the plan, when approved by the PUCO, becomes state action.

The violation of privacy rights caused by the automatic callback service outweighs the profitmaking motives of Ohio Bell. Thus, I would find this state action to be unconstitutional.  The automatic callback service provides no mechanism for victims of domestic violence to prevent their abusers from participating in this service.   Abusers who are called by their victims can obtain their victims' telephone numbers with the use of the automatic callback service.  Armed with this number, an abuser could ascertain the location of his victim, which, in turn, not only threatens his victim with physical harm, but also imperils those who harbor her.

The minimal level of utility derived from the offering of an

automatic callback service hardly justifies the haunting that
abusers can direct to their victims thanks to this service.