59 P.3d 1201 (2002)
Larry D. HIIBEL, Petitioner,
v.
The SIXTH JUDICIAL DISTRICT COURT of The State of Nevada, in and for the COUNTY OF HUMBOLDT, and the Honorable Richard A. Wagner, District Judge, Respondents, and
The State of Nevada, Real Party in Interest.
No. 38876.
Supreme Court of Nevada.
December 20, 2002.
*1202 Steven G. McGuire, State Public Defender, and James P. Logan, Chief Deputy Public Defender, Carson City, for Petitioner.
Frankie Sue Del Papa, Attorney General, Carson City; David G. Allison, District Attorney, and Conrad Hafen, Chief Deputy District Attorney, Humboldt County, for Real Party in Interest.
Before the Court En Banc.

OPINION
YOUNG, C.J.
The pertinent issue before us is whether NRS 171.123(3), which requires a person *1203 stopped under reasonable suspicion by a police officer to identify himself or herself, violates the Fourth Amendment of the United States Constitution. We conclude NRS 171.123(3) does not violate the Fourth Amendment because it strikes a balance between constitutional protections of privacy and the need to protect police officers and the public. Therefore, Hiibel's petition for a writ of certiorari is denied.
In pertinent part, NRS 171.123 provides:
1. Any peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing or is about to commit a crime.
....
3. The officer may detain the person pursuant to this section only to ascertain his identity and the suspicious circumstances surrounding his presence abroad. Any person so detained shall identify himself, but may not be compelled to answer any other inquiry of any peace officer.
4. A person may not be detained longer than is reasonably necessary to effect the purposes of this section, and in no event longer than 60 minutes.
In response to a call from police dispatch, Humboldt County Sheriff's Deputy Lee Dove drove to the scene where a concerned citizen had observed someone striking a female passenger inside a truck. There, Dove spoke to the concerned citizen and was directed to a parked truck. When Dove approached the truck, he noticed skid marks in the gravel, suggesting the truck had been parked in a sudden and aggressive manner. Dove saw Larry D. Hiibel standing outside the truck and thought he was intoxicated based on his eyes, mannerisms, speech, and odor. Hiibel's minor daughter was in the passenger side of the truck. When Dove asked Hiibel to identify himself, Hiibel refused. Instead, Hiibel placed his hands behind his back and challenged the officer to take him to jail.
Hiibel said he would cooperate but was unwilling to provide identification, because he did not believe he had done anything wrong. After eleven requests for identification, to no avail, Dove arrested Hiibel. Dove described the situation as follows:
[D]uring my conversation with Mr. Hiibel, there was a point where he became somewhat agressive [sic].
I felt based on me not being able to find out who he was, to identify him, I didn't know if he was wanted or what is [sic] situation was, I [w]asn't able to determine what was going on crimewise in the vehicle, based on that I felt he was intoxicated, and how he was becoming aggressive and moody, I went ahead and put him in handcuffs so I could secure him for my safety, and put him in my patrol vehicle.
Hiibel was charged and found guilty of resisting a public officer, in violation of NRS 199.280.[1] The justice of the peace in Humboldt County determined that "[Hiibel] was asked only for identification and failure to provide identification obstructed and delayed Dove as a public officer in attempting to discharge his duty."
On appeal, the district court held it was "reasonable and necessary" for Dove to request identification from Hiibel and affirmed Hiibel's conviction. Evidence "over and above simply failing to identify himself" was found to support Hiibel's arrest and conviction, which included Dove's suspicion that Hiibel engaged in driving under the influence. The district court balanced the public's interest in requiring Hiibel to identify himself against Hiibel's Fifth Amendment right to remain silent. The district court determined it was crucial for the safety of an officer and possible victims to know the identity *1204 of a person suspected of battery, domestic violence, and driving under the influence.
We conclude this case is properly before this court pursuant to NRS 34.020(3), because the constitutionality of NRS 171.123(3) presents an issue of first impression. Accordingly, we will address the merits of Hiibel's constitutional challenge to NRS 171.123(3).
Fundamental to a democratic society is the ability to wander freely[2] and anonymously, if we so choose, without being compelled to divulge information to the government about who we are or what we are doing.[3] This "right to be let alone"[4]to simply live in privacyis a right protected by the Fourth Amendment and undoubtedly sacred to us all.[5]
Yet, this right to privacy is not absolute.[6] Like all freedoms we enjoy, it includes both limitations and responsibilities. One such limitation to the right of privacy is reasonableness. The Fourth Amendment only protects against "unreasonable" invasions of privacy, or searches and seizures, by the government.[7]
The United States Supreme Court has twice expressly refused to address whether a person reasonably suspected of engaging in criminal behavior may be required to identify himself or herself.[8] Therefore, the issue is unresolved.[9]
There is a split of authority among the federal circuit courts of appeals on this issue.[10] In Oliver v. Woods,[11] the Tenth Circuit Court of Appeals upheld a Utah statute that requires individuals to produce identification to an officer during an investigatory stop. However, in Carey v. Nevada Gaming Control Board,[12] the Ninth Circuit Court of Appeals held that NRS 171.123(3) violates the Fourth Amendment because "`the serious intrusion on personal security outweighs the mere possibility that identification [might] provide a link leading to arrest."'[13] We find the reasoning in Carey to be unpersuasive. Given the conflicting authority, we believe an independent analysis of the constitutionality of NRS 171.123(3) is warranted.
Traditionally, in resolving issues implicating the Fourth Amendment right to *1205 privacy, the following touchstone question has been asked: Is the invasion of privacy reasonable?[14] Reasonableness is determined by balancing "`the public interest and the individual's right to personal security free from arbitrary interference by law officers."'[15] Considerations involve the "weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[16] A primary concern is "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."[17]
Balancing these interests, we conclude that any intrusion on privacy caused by NRS 171.123(3) is outweighed by the benefits to officers and community safety. The public interest in requiring individuals to identify themselves to officers when a reasonable suspicion exists is overwhelming. The United States Supreme Court has recognized that "American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded."[18] The most dangerous time for an officer may be during an investigative stopwhen a suspect is approached and questioned.
Judicial notice is taken that in the year 2000, fifty-one officers were murdered in the line of duty.[19] These homicides occurred as follows: thirteen during traffic stops/pursuits, twelve during arrest situations, ten during ambushes, eight during responses to disturbance calls, six during investigations of suspicious persons, and two during prisoner transport.[20] Of the suspects who committed these killings, twenty had been previously arrested for crimes of violence, nine had previously assaulted a police officer, and twelve were on probation or parole.[21] Moreover, 15,915 officers were assaulted that year.[22] If the officers referenced in these statistics had known the identity and history of their attackers prior to being assaulted or killed, perhaps some of these incidents could have been prevented.
Knowing the identity of a suspect allows officers to more accurately evaluate and predict potential dangers that may arise during an investigative stop. It follows that an officer "making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect."[23] For example, the suspect may be a former felon or wanted for an outstanding arrest warrant. Such persons pose a heightened risk of danger to officers and the public during investigatory encounters.
Additionally, if suspects are not legally required to identify themselves, what could an officer do if a suspicious person were loitering outside a daycare center or school? Perhaps that person is a sex offender. How are officers to enforce restraining orders? Or, how are officers to enforce curfew laws for minors without a requirement to produce identification? In these situations, it is the observable conduct that creates a reasonable *1206 suspicion, but it is the requirement to produce identification that enables an officer to determine whether the suspect is breaking the law.
Most importantly, we are at war against enemies who operate with concealed identities and the dangers we face as a nation are unparalleled. Terrorism is "changing the way we live and the way we act and the way we think."[24] During the recent past, this country suffered the tragic deaths of more than 3,000 unsuspecting men, women, and children at the hands of terrorists; seventeen innocent people in six different states were randomly gunned down by snipers; and our citizens have suffered illness and death from exposure to mail contaminated with Anthrax. We have also seen high school students transport guns to school and randomly gun down their fellow classmates and teachers. It cannot be stressed enough: "This is a different kind of war that requires a different type of approach and a different type of mentality."[25] To deny officers the ability to request identification from suspicious persons creates a situation where an officer could approach a wanted terrorist or sniper but be unable to identify him or her if the person's behavior does not rise to the level of probable cause necessary for an arrest.
Contrary to the dissent's opinion, requiring a suspect to reveal his name is not an abrogation of the Bill of Rights. "Bills of rights give assurance to the individual of the preservation of his liberty. They do not define the liberty they promise."[26] Furthermore, it has been recognized since the early development of common law that "[a]ll rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached."[27] The point of requiring a suspect to provide identification during a lawful investigatory stop has been reached.
The requirements of NRS 171.123(3) are also reasonable and involve a minimal invasion of personal privacy.[28] Reasonable people do not expect their identitiestheir namesto be withheld from officers. Rather, we reveal our names in a variety of situations every day without much consideration. For instance, it is merely polite manners to introduce ourselves when meeting a new acquaintance. A person's name is given out on business cards, credit cards, checks, and driver's licenses, to name a few more instances. In addition, everyone is required to reveal government issued identification to airport officials and are subject to random searches before proceeding to flight gates. Asking a suspect to state his or her name when an officer has an articulable suspicion is nominal in comparison.
To hold that a name, which is neutral and non-incriminating information, is somehow an invasion of privacy is untenable. Such an invasion is minimal at best. The suspect is not required to provide private details about his background, but merely to state his name to an officer when reasonable suspicion exists. The Supreme Court held it reasonable for officers to pat down and frisk a person during an investigative stop.[29] As the Court recognized in Terry v. Ohio, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."[30] Requiring identification is far less intrusive than conducting a pat down search of one's physical person.
*1207 Here, Hiibel was suspected of domestic violence against his minor daughter and driving under the influence of alcohol. Based on skid marks in the gravel, it appeared that Hiibel parked his truck in a quick and aggressive manner. Hiibel refused eleven requests by officers to identify himself. Instead, Hiibel placed his hands behind his back and challenged the deputy to take him to jail. An ordinary person would conclude it was Hiibel who was unreasonable, not the law.
Finally, NRS 171.123(3) is narrowly written. It applies only in situations where an officer has an articulable suspicion that a person is engaged in criminal behavior. "[C]ommon sense often makes good law," once wrote United States Supreme Court Justice William O. Douglas.[31] Requiring a person reasonably suspected of committing a crime to identify himself or herself to law enforcement officers during a brief, investigatory stop is a commonsense requirement necessary to protect both the public and law enforcement officers. It follows that NRS 171.123(3) is good law consistent with the Fourth Amendment.[32]
LEAVITT and BECKER, JJ., concur.
MAUPIN, J., concurring.
I join in the result reached by the majority, stressing again that NRS 171.123 is narrowly written, and that its requirement that persons reasonably suspected of criminal misconduct be required to identify themselves to police during brief investigatory stops is a commonsense requirement for the protection of the public and law enforcement officers.
I write separately to note that the majority has not somehow overreacted to the dangers presented by the war against domestic and international terrorism. Our decision today is truly related to the ability of police to properly and safely deal with persons reasonably suspected of criminal misconduct, here, domestic violence and driving under the influence of alcohol.
Notwithstanding the sentiments voiced by my dissenting colleagues, NRS 171.123, as stated by Young, C.J., in the majority opinion, "is good law consistent with the Fourth Amendment."
AGOSTI, J., with whom SHEARING and ROSE, JJ., agree, dissenting.
As the majority aptly states, the right to wander freely and anonymously, if we so choose, is a fundamental right of privacy in a democratic society. However, the majority promptly abandons this fundamental right by requiring "suspicious" citizens to identify themselves to law enforcement officers upon request, or face the prospect of arrest. I dissent from the majority's holding that the identification portion of NRS 171.123 is constitutional.
It is well-established that police officers may stop a person when reasonable suspicion exists that that person is engaged in illegal activity.[1] However, it is equally well-established that detaining a person and requiring him to identify himself constitutes "a seizure of his person subject to the requirements of the Fourth Amendment."[2] In light of these constitutional requirements, the United States Supreme Court has stated that although the officers may question the person, the detainee need not answer any questions.[3] Furthermore, unless the detainee volunteers answers and those answers supply the officer with probable cause to arrest, the detainee must be released.[4]
The Fourth Amendment requires that governmental searches and seizures be reasonable. Reasonableness is determined by "a *1208 weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[5] A court's primary concern in weighing these interests is to assure "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers."[6]
Anonymity is encompassed within the expectation of privacy, a civil liberty that is protected during a Terry stop. The majority now carves away at that individual liberty by saying that a detainee must surrender his or her identity to the police.
I agree with the Ninth Circuit Court of Appeals' reasoning on the issue of whether a person may be arrested for refusing to identify himself during a Terry stop.[7] In Martinelli v. City of Beaumont,[8] a woman was arrested for delaying a lawful police investigation by refusing to identify herself during a Terry investigation.[9] The court held that allowing the police officers to arrest the woman for failing to identify herself in effect allowed the officers to "`bootstrap the authority to arrest on less than probable cause.'"[10] The court determined that the woman's interest in her personal security outweighed the "`mere possibility that identification may provide a link leading to arrest.'"[11]
More directly on point, the Ninth Circuit in Carey v. Nevada Gaming Control Board[12] addressed the constitutionality of NRS 171.123(3), the very statute at issue here. In Carey, a casino patron brought a claim under 42 U.S.C. § 1983 against a Nevada Gaming Control Board agent for violating his Fourth, Fifth and Fourteenth Amendment rights.[13] The agent was called to a hotel to investigate Carey and another man, who were both suspected by hotel employees of cheating.[14] The agent caused the men to be detained, identified himself, indicated he was investigating gaming law violations, read them their Miranda rights and conducted a pat-down search of both detainees.[15] During the Terry investigation, the agent determined there was no probable cause to arrest the men for gaming violations.[16] However, when the agent asked the men to identify themselves, Carey refused, and he was arrested pursuant to NRS 171.123(3) and NRS 197.190.[17] On appeal, the Ninth Circuit noted that the agent had reasonable suspicion to conduct a Terry stop, and also probable cause to arrest Carey under NRS 171.123(3) and NRS 197.190 once Carey refused to identify himself. However, the court concluded that NRS 171.123(3) and NRS 197.190, as applied to Carey, violated the Fourth Amendment because the United States Supreme Court "has consistently recognized that a person detained pursuant to Terry `"is not obliged to answer"'" questions posed by law enforcement officers.[18] The court determined that Carey's interest in his personal security outweighed any potential link leading to arrest that could be gleaned from his identity, particularly because Carey's name "was not relevant to determining whether Carey had cheated."[19] *1209 Despite the above authority, the majority erroneously affirms Hiibel's conviction by reflexively reasoning that the public interest in police and public safety outweighs Hiibel's interest in refusing to identify himself. I am not persuaded. And I am uneasy about the reasons given by the majority in justifying its holding.
The majority concludes that the governmental interest in police safety outweighs an individual's interest in his right to keep private his identity. The majority relies upon FBI statistics about police fatalities and assaults to support its argument. However, it does not provide any evidence that an officer, by knowing a person's identity, is better protected from potential violence. In Terry, the United States Supreme Court addressed the issue of officer safety by carving out an exception to the Fourth Amendment to allow a police officer to make certain that the person being detained "is not armed with a weapon that could unexpectedly and fatally be used against him"[20] when the officer reasonably believes "he is dealing with an armed and dangerous individual."[21] The purpose of such a search is to ensure the detainee is not armed with a weapon that could be immediately used against a police officer, not to ensure against a detainee's propensity for violence based upon a prior record of criminal behavior.
It is well known that within the context of a Terry stop an officer's authority to search is limited to a pat-down to detect weapons. The officer may investigate a hard object because it might be a gun. An officer may not investigate a soft object he detects, even though it might be drugs. Similarly, an officer may not detect a wallet and remove it for search. With today's majority decision, the officer can now, figuratively, reach in, grab the wallet and pull out the detainee's identification. So much for our right to be left alone or as the majority saysto wander freely and anonymously if we choose.
The majority avoids the fact that knowing a suspect's identity does not alleviate any threat of immediate danger by arguing that a reasonable person cannot expect to withhold his identity from police officers, as we reveal our names to different people everyday. What the majority fails to recognize, however, is that when we give our names to new acquaintances, business associates and shop owners, we do so voluntarily, out of friendship or to complete a transaction. With the heightened security at airports, for example, passengers are required to provide picture identification. But non-passengers are free to wander that portion of the airport that is unsecured without showing an ID. Purchasing an airline ticket is a business transaction, and the airlines may condition the sale on knowing who is the purchaser. In contrast, being forced to identify oneself to a police officer or else face arrest is government coercionprecisely the type of governmental intrusion that the Fourth Amendment was designed to prevent. Furthermore, it is not necessary to have one's name on a credit card or checkbook in order to effect a purchase. A dedicated libertarian, for example, might deliberately eschew financial institutions, credit cards and checkbooks, engaging solely in cash transactions, in order to jealously protect his individual rights, especially his right to be anonymous, to be left alone, to wander freely.
Finally, the majority also makes an emotional appeal based upon fear and speculation by arguing that the police would be powerless to protect innocent children from sex offenders, to enforce restraining orders, and to enforce curfews for minors. What the majority fails to recognize is that it is the observable conduct, not the identity, of a person, upon which an officer must legally rely when investigating crimes and enforcing the law.
The majority further appeals to the public's fear during this time of war "against an enemy who operates with a concealed identity." Now is precisely the time when our duty to vigilantly guard the rights enumerated in the Constitution becomes most important. To ease our guard now, in the wake of fear of unknown perpetrators who may still seek to harm the United States and its people, *1210 would sound the call of retreat and begin the erosion of civil liberties. The court must not be blinded by fear. I am reminded of a statement by Justice Felix Frankfurter, so aptly quoted by Chief Justice Young, the majority's author, in another search and seizure case involving individual liberties protected by the Fourth Amendment:
"[W]e are in danger of forgetting that the Bill of Rights reflects experience with police excesses. It is not only under Nazi rule that police excesses are inimical to freedom. It is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end."[22]
The majority, by its decision today, has allowed the first layer of our civil liberties to be whittled away. The holding weakens the democratic principles upon which this great nation was founded. The undermining of that foundation is a harm more devastating to our country and to this State than any physical harm a terrorist could possibly inflict. "It would indeed be ironic if, in the name of national defense, we would sanction the subversion of ... liberties ... which make[] the defense of the Nation worthwhile."[23] Our nation is besieged. The terrorist threat has shaken our complacency. Our way of life is threatened as never before. At this time, this extraordinary time, the true test of our national courage is not our necessary and steadfast resolve to defend ourselves against terrorist activity. The true test is our necessary and steadfast resolve to protect and safeguard the rights and principles upon which our nation was founded, our constitution and our personal liberties. I dissent from the majority's retreat from this challenge.
SHEARING and ROSE, JJ., concur.
NOTES
[1] NRS 199.280 states:

A person who, in any case or under any circumstances not otherwise specially provided for, willfully resists, delays or obstructs a public officer in discharging or attempting to discharge any legal duty of his office shall be punished:
1. Where a dangerous weapon is used in the course of such resistance, obstruction or delay, for a category D felony as provided in NRS 193.130.
2. Where no dangerous weapon is used in the course of such resistance, obstruction or delay, for a misdemeanor.
Hiibel was also arrested for the misdemeanor charge of domestic battery. This charge was dismissed at the State's request, prior to trial.
[2] See Papachristou v. City of Jacksonville, 405 U.S. 156, 164, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).
[3] Brown v. Texas, 443 U.S. 47, 52-53, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
[4] Public Utilities Comm'n v. Pollak, 343 U.S. 451, 468, 72 S.Ct. 813, 96 L.Ed. 1068 (1952) (Douglas, J., dissenting).
[5] Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (citing Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)).
[6] Id.
[7] Id. (citing Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).
[8] Brown, 443 U.S. at 53 n. 3, 99 S.Ct. 2637 ("We need not decide whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements."); Kolender v. Lawson, 461 U.S. 352, 361-62 n. 10, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (holding that a California statute requiring an individual who loitered or wandered the streets to produce "credible and reliable" identification to an officer upon request of a police officer was unconstitutional on vagueness grounds, but refusing to consider whether the statute violated the Fourth Amendment).
[9] Albright v. Rodriguez, 51 F.3d 1531, 1537-38 (10th Cir.1995); Gainor v. Rogers, 973 F.2d 1379, 1386 n. 10, 1389 (8th Cir.1992) (noting that Supreme Court has not determined whether an officer may arrest an individual for refusing to identify himself or herself during an investigative stop); Tom v. Voida, 963 F.2d 952, 959 n. 8 (7th Cir.1992) (observing that whether individuals may refuse to answer questions asked by an officer during an investigative stop is a question unanswered by the Supreme Court).
[10] Compare Carey v. Nevada Gaming Control Bd., 279 F.3d 873, 881 (9th Cir.2002), and Martinelli v. City of Beaumont, 820 F.2d 1491, 1494 (9th Cir.1987), with Oliver v. Woods, 209 F.3d 1179, 1190 (10th Cir.2000), and Albright, 51 F.3d at 1537.
[11] 209 F.3d at 1190.
[12] 279 F.3d 873.
[13] Id. at 880 (quoting Lawson v. Kolender, 658 F.2d 1362, 1366-67 (9th Cir.1981), aff'd, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).
[14] Terry, 392 U.S. at 9, 88 S.Ct. 1868.
[15] Brown, 443 U.S. at 50, 99 S.Ct. 2637 (quoting Pennsylvania v. Mimms, 434 U.S. 106, 109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).
[16] Id. at 50-51, 99 S.Ct. 2637 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).
[17] Id. at 51, 99 S.Ct. 2637 (citing Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)).
[18] Terry, 392 U.S. at 23, 88 S.Ct. 1868.
[19] Federal Bureau of Investigation, U.S. Dep't of Justice, Crime in the United States 2000, at 291 (2001).
[20] Federal Bureau of Investigation, U.S. Dep't of Justice, Law Enforcement Officers Killed and Assaulted, 2000, at 28 (2001), at http://www.fbi.gov/ucr/killed/00leoka.pdf (last visited Nov. 12, 2002) (this document was discontinued in print after 1999 and is now only available on the Internet as referenced above).
[21] Id. at 4, 88 S.Ct. 1868.
[22] Id. at 75, 88 S.Ct. 1868.
[23] Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
[24] Interview by Tony Snow with Senator Tom Daschle, United States Senate, Washington, D.C. (Oct. 21, 2002), http://www.foxnews.com/story/0,2933,66236,00.html.
[25] President George W. Bush, Address During a News Conference (Oct. 11, 2001), http://www. cnn.com/2001/US/10/11/gen.bush.transcript/index. html.
[26] Benjamin N. Cardozo, The Paradoxes of Legal Science 97 (1928).
[27] Hudson Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908).
[28] Adams, 407 U.S. at 146, 92 S.Ct. 1921 ("A brief stop of a suspicious individual, in order to determine his identity ... may be most reasonable in light of the facts known to the officer at the time.") (citing Terry, 392 U.S. at 21-22, 88 S.Ct. 1868).
[29] Terry, 392 U.S. at 24, 88 S.Ct. 1868.
[30] Id. at 23, 88 S.Ct. 1868.
[31] Peak v. United States, 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957).
[32] The dissent, as dramatically worded as it is, does not refute this position.
[1] Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also State v. Lisenbee, 116 Nev. 1124, 1127, 13 P.3d 947, 949 (2000).
[2] Brown v. Texas, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).
[3] Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
[4] Id. at 439-40, 104 S.Ct. 3138; see Kolender v. Lawson, 461 U.S. 352, 360 n. 9, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).
[5] Brown, 443 U.S. at 50-51, 99 S.Ct. 2637.
[6] Id. at 51, 99 S.Ct. 2637.
[7] Although the United States Supreme Court has not yet addressed this issue and there is a split of federal authority, I find the Ninth Circuit's approach to be the more lucid one.
[8] 820 F.2d 1491 (9th Cir.1987).
[9] Id. at 1492.
[10] Id. at 1494 (quoting Lawson v. Kolender, 658 F.2d 1362, 1366 (9th Cir.1981), aff'd, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).
[11] Id. (quoting Lawson, 658 F.2d at 1366-67).
[12] 279 F.3d 873 (9th Cir.2002).
[13] Id. at 876.
[14] Id.
[15] Id.
[16] Id.
[17] Id. at 876, 879-80.
[18] Id. at 881-82 (quoting Dunaway v. New York, 442 U.S. 200, 211 n. 12, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (quoting Terry v. Ohio, 392 U.S. 1, 34, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968))).
[19] Id. at 880.
[20] Terry, 392 U.S. at 23, 88 S.Ct. 1868.
[21] Id. at 27, 88 S.Ct. 1868.
[22] Barrios-Lomeli v. State, 114 Nev. 779, 782, 961 P.2d 750, 752 (1998) (quoting Davis v. United States, 328 U.S. 582, 597, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946) (Frankfurter, J., dissenting)).
[23] United States v. Robel, 389 U.S. 258, 264, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).